[No. 16124. *En Banc.* November 14, 1921.]

# JAFET LINDEBERG, *Respondent*, v. JAMES A. MURRAY, *Appellant.*[1]

EQUITY (6)—GROUNDS FOR RELIEF—MISTAKE OF FACTS—RESCISSION OF CONTRACT. The true test in cases involving mutual mistake of fact being whether the contract would have been entered into had there been no mistake, a contract is subject to rescission, where there is a clear *bona fide* mistake regarding material facts, without culpable negligence on the part of the person complaining.

CONTRACTS (116) — RESCISSION — MISTAKE OF FACT — EVIDENCE — SUFFICIENCY. Where, as part of the agreement for a bank's taking over the assets and liabilities of another bank in straitened circumstances, it was agreed by the president of the former bank to buy the stock of the principal shareholder of the embarrassed bank, but, owing to the discovery of a heavy defalcation of the latter's funds, the original agreement for the transfer was rescinded and a new arrangement made, the contract for sale of the principal shareholder's stock was such a part of the rescinded contract as to be likewise subject to rescission.

MACKINTOSH, HOLCOMB, and HOVEY, JJ., dissent.

Appeal from a judgment of the superior court for King county, Tallman, J., entered April 30, 1920, in favor of the plaintiff, in an action for equitable relief, tried to the court. Affirmed.

*Stephen V. Carey,* for appellant.

*Williamson, Freeman & Broenkow,* for respondent.

TOLMAN, J.—Appellant, James A. Murray, has appealed from a decree entered by the trial court rescinding a contract whereby the respondent, Lindeberg, agreed to purchase, and appellant, Murray, agreed to sell, 1,519 shares of the capital stock of the Bankers Trust Company of Tacoma for the sum of $14,000. It is conceded that the case turns almost entirely upon questions of fact, and while there is com-

[1]Reported in 201 Pac. 759.

paratively little dispute regarding the facts, the parties are widely apart in the construction and emphasis which they lay upon the facts, and in the conclusions which they draw therefrom.

The history of the transactions out of which this action arises is long and complicated, and a full and complete statement of all the facts shown by the record would occupy far too much space; therefore, in our statement of the facts and discussion, we have limited ourselves to such facts as seem to be necessary for an understanding of the points raised and relied upon by the appellant. Other facts are called to our attention, but after a careful reading of the record, we do not regard them as controlling.

The Bankers Trust Company being in financial difficulties, the stockholders, in March, 1917, authorized the directors to convert the assets into cash and liquidate its affairs. At this time appellant was its principal stockholder, owning 1,519 shares out of a total of 3,000 shares of the capital stock of the trust company. Nothing was accomplished in the way of liquidation for some months, and in the fall of the year 1917, the bank examiner insisted upon the levying of a one hundred per cent assessment against the stockholders, or, as the only alternative, that the institution be closed. Being unwilling to submit to the assessment, the officers and stockholders determined to voluntarily liquidate under some plan which would be agreeable to the bank examiner. The Scandinavian-American Bank of Tacoma, seeking an opportunity to secure the business of the depositors of the Bankers Trust Company, entered into negotiations with appellant, James A. Murray, through his nephew and agent, James E. Murray, and with the officers of the trust company, looking towards the liquidation of the trust company through the Scandinavian-American Bank. Respondent, Linde-

berg, was an officer and stockholder of the Scandinavian-American Bank, and became interested through a desire to assist the bank, and also, perhaps, because of a possible opportunity to realize a profit upon the purchase of appellant's· stock in the trust company. Mr. Lindeberg and appellant's agent, James E. Murray, were brought together about November 7, 1917, and after some negotiations they arrived at an understanding which James E. Murray submitted to his principal, the appellant, in a telegram reading as follows:

"Seattle, Wash., November 8th, 1917.
"Mr. James A. Murray,
"Montezuma Hotel,
"Nogales, Ariz.

"Have closed deal with Scandinavian-American Bank, turning over all assets for twenty-eight thousand dollars, to be distributed pro rata amongst the stockholders, Scandinavian paying all deposits and obligations and saving stockholders harmless, you to take out properties at prices as follows: Bank Building two hundred thousand, Regents twenty-five thousand, Manning note seventeen thousand, J Street property three thousand five hundred, total two hundred forty-five thousand five hundred. Stop. Your deposit and interest one hundred twenty thousand, your share of dividend fourteen thousand, therefore must provide additional to this approximately one hundred twelve thousand when property mentioned will be deeded to you clear of all incumbrances. Consider deal a good one and am anxious to close immediately fearing complications.         "James E. Murray."

It being understood that, if appellant should approve the plan outlined in the telegram, the necessary formal papers would be executed. Appellant replied to this telegram, giving the plan his approval, and provided the funds necessary to carry it into effect. Thereafter Mr. Larson, representing the Scandinavian-American Bank, declined to carry out the arrangement

outlined in the telegram quoted. Mr. James E. Murray renewed negotiations with others, but on November 13, 1917, the parties again got together and made the agreement out of which this controversy immediately arises, which agreement is as follows:

"AGREEMENT

"This agreement, Made this 13th day of November, A. D. 1917, by and between James A. Murray, of Butte, Montana, as party of the first part, and Jafet Lindeberg, of San Francisco, California, as party of the second part,

"Witnesseth: That the said party of the first part hereby sells to the party of the second part fifteen hundred nineteen (1519) shares of the capital stock of the Bankers Trust Company of Tacoma, for the sum of fourteen thousand dollars ($14,000) it being understood that the said party of the second part shall, upon the execution of this agreement, deposit in the American Savings Bank & Trust Company of Seattle, the said sum of fourteen thousand dollars ($14,000), the same to be delivered to the said James A. Murray upon the surrender by James A. Murray of the fifteen hundred nineteen (1519) shares of the capital stock of the Bankers Trust Company of Tacoma, which stock is to be delivered on or before thirty (30) days from the execution of this instrument, it being understood and agreed, and the said party of the second part hereby binds himself to save the said James A. Murray harmless from any liability or assessment on said stock.

"James A. Murray,
"By James E. Murray, His Agent and Attorney-in-fact.
"Jafet Lindeberg."

It is undisputed that, at the time this contract was executed, the books of the Bankers Trust Company showed that its assets were ample to take care of all its liabilities. On the day following the execution of this agreement, Mr. Larson, as manager of the Scandinavian-American Bank, forwarded to the American

Savings Bank & Trust Company at Seattle a cashier's check for $14,000, payable to the order of appellant, with directions to deliver the check upon the surrender of the 1,519 shares of stock of the Bankers Trust Company properly endorsed. The receipt of this check was acknowledged under date of November 15, 1917. On the same day appellant was advised by the American Savings Bank & Trust Company, by telegram, that the check had been deposited and that the stock should be forwarded. On the evening of November 15, 1917, a shortage was found in the assets of the Bankers Trust Company amounting to the sum of $17,175.86, due to the defalcation of a bookkeeper, who, by a system of false entries, had succeeded in passing through the Bankers Trust Company a number of checks drawn by himself which he had caused to be charged to the accounts of various depositors, so that the trust company in fact owed its depositors $17,-175.86 in excess of the amount shown by its books to be due depositors. Before this shortage was discovered, James E. Murray, the agent of appellant, who had conducted the negotiations, had returned to his home in Butte, Montana, but before he left Tacoma the arrangements for turning the assets of the Bankers Trust Company over to the Scandinavian-American Bank had been completed contemporaneously with the execution of the agreement for the sale of the stock hereinbefore set forth, by the adoption of the proper resolutions by the directors of the Bankers Trust Company on November 13, 1917, which, among other things, provided that the Scandinavian-American Bank should save the trust company stockholders harmless from any stock liability. Respondent, Lindeberg, had also departed for his home in California, leaving the carrying out of the details to Mr. Larson of the Scandinavian-American Bank.

Pursuant to the contract between the two banks, the Scandinavian-American Bank was to take actual possession of the Bankers Trust Company at the close of business on Saturday, November 17, 1917, so that the transfer, so far as the public was concerned, should be effected on Monday, November 19, at which time the depositors' accounts would be written into the books of the Scandinavian-American Bank. The discovery of the defalcation came as a complete surprise to everybody, and of course presented a situation which had not been theretofore contemplated by either party. The directors of the trust company feeling that the Scandinavian-American Bank would, on discovery of the defalcation, refuse to go further, and that in such event the bank examiner would immediately take possession, which all were anxious to prevent, concluded that something must be done immediately that same night if the bank was to open in the morning. Mr. Larson was informed of the defalcation, and he and a Mr. Heitman, who had been acting as a broker in the matter (each party now asserting that he was the agent of the other), immediately called up Mr. James E. Murray in Butte, by long distance telephone, and acquainted him with the situation. The parties are not in accord as to the nature of the conversation had with Mr. Murray over the telephone. Mr. Larson testified that he told Mr. Murray that Mr. Lindeberg would not purchase the stock under the conditions as they then appeared, and that the Scandinavian-American Bank would not proceed with the liquidation. James E. Murray in his testimony denies that anything was said in this telephone conversation about calling the deal off. Mr. Heitman testifies that he told Mr. Murray over the telephone that Mr. Larson, representing the respondent, was hesitating, and that Murray replied: "If he don't want to go through with it

we can liquidate the bank ourselves." All agree that James E. Murray, in the telephone conversation, gave them no satisfaction, and committed himself to nothing except that he was sorry to learn of the additional trouble.

Following this telephone conversation, the bank examiner was called in and met with the directors of the trust company early on the morning of November 16, at which meeting Mr. Larson was present and gave notice that the Scandinavian-American Bank would not carry out the agreement of the 13th, and also the bank examiner advised all present that he would not permit that agreement, which relieved the stockholders of their double liability, to be carried out, and they would have to perfect some other plan immediately or he would close the institution. Realizing the situation, the board of directors authorized the execution of a new agreement with the Scandinavian-American Bank, which met with the approval of the bank examiner, and is as follows:

"Tacoma, Washington, Nov. 16th, 1917.

"A special meeting of the board of directors of the Bankers Trust Company was held at the city of Tacoma on November 16th, 1917, at the hour of nine ·o'clock a. m., at which meeting all of the members of the said board were present and consented to the holding of said meeting and waived any and all notice thereof.

"It was reported that, upon checking up the books and accounts of the said bank, that a shortage of about $17,125, caused by the defalcation of the bookkeeper McDonald, had been found and that said McDonald had confessed thereto.

"In view of such shortage, the board after discussion recognized that the Scandinavian-American Bank of Tacoma, Washington, could not be expected to carry out its agreement heretofore made to save the

stockholders of this bank from an assessment upon their stock in case the assets were found insufficient to pay all of its liabilities, and after going over the matter with the bank examiner, Mr. Hanson, and his deputy, Mr. Moore, and with the officers of the said Scandinavian-American Bank, the following resolution was offered by Mr. Wright, and seconded by Mr. Danaher and unanimously adopted, to-wit:

"Whereas, a defalcation and embezzlement of about $17,125 of this institution's money has been made by McDonald, the bookkeeper, and

"Whereas, the Scandinavian-American Bank of Tacoma refuses to guarantee to hold the stockholders of this bank harmless from any liability as such, by reason of such defalcation; and

"Whereas, we believe it is for the best interests of all concerned that this bank be liquidated through the Scandinavian-American Bank of Tacoma, and that the stockholders of this bank agree to guarantee and hold harmless the said Scandinavian-American Bank from any loss in its liquidation thereof; and

"Whereas, the said Scandinavian-American Bank agrees to proceed to liquidate this bank in case we convert certain of our assets into cash in compliance with the terms and conditions of the proposed plan outlined in our minutes of November 13th, 1917;

"Now, therefore, be it resolved, that in consideration of the said Scandinavian-American Bank of Tacoma taking over our deposits and paying our depositors and assuming and agreeing to pay all of our contracts and engagements, that the liability of each and every one of the stockholders of the said Bankers Trust Company shall continue and be in full force and effect until sufficient assets have been converted into cash to meet the established liabilities; and

"Be it further resolved, that the Bankers Trust Company sell, assign, transfer and convey to James A. Murray the following described property for the prices set opposite each item, in conformity with his offer heretofore made and outlined in our minutes of November 13th, 1917, to-wit:

Bankers Trust Building, supplies and
   personalty ..........................$200,000.00
Regent Theater Building................. 25,000.00
L. R. Manning note and securities........ 17,000.00
The "J" Street residence property....... 3,500.00

                                       $245,500.00

The purchase price of said property to be as follows, to-wit: Total selling price $245,500; the said James A. Murray to be allowed a credit for the full amount of his deposit in the Bankers Trust Company and all accrued interest thereon amounting in all to the sum of $120,000 to apply as a part payment on the purchase price of said property, the balance of said purchase price to be paid in cash by said James A. Murray, or his assigns upon the delivery of deeds and abstracts showing merchantable title, said deeds and abstracts to be delivered to and deposited with the American Savings Bank & Trust Company of Seattle, with directions to deliver the same to said James A. Murray or his assigns upon the payment of the balance of the purchase price herein specified, allowing a credit of $120,000 as above mentioned, and the balance of the said purchase price, to-wit: $125,500 to be paid in cash, and

"Be it further resolved that J. F. Murphy, as vice-president and M. M. Ogden, as secretary, of this corporation, be and they are hereby authorized, empowered and directed to procure the necessary abstracts, make, execute and deliver to the said James A. Murray, or to his assigns, the necessary deeds of conveyance and assignment, granting, conveying and assigning to the said James A. Murray, or his assigns, the said described property free and clear of all incumbrances, except as above mentioned, and receive the purchase price therefor, the same to be paid in the manner above specified.

"The above action was taken under authority vested in the board of directors by the stockholders at their meeting held on March 17, 1917.

"Mr. J. C. Heitman, representing Mr. James A. Murray, was present at this meeting and stated that

Mr. Murray's agreement to purchase the assets above mentioned would be carried out notwithstanding the new developments hereinabove mentioned.

"There being no further business the meeting adjourned.

> "J. F. Murphy
> "Geo. P. Wright
> "M. A. Cole
> "W. C. Wheeler
> "C. F. Danaher
> "Guy E. Kelly
> "M. M. Ogden,
> "Directors."

"Appointment of committees, Nov. 16, 1917.

"The chairman appointed a committee consisting of Guy E. Kelly and M. M. Ogden to consult with Mr. Edwards of the Northern Bank & Trust Company of Seattle, regarding the Phillips indebtedness, to consult with the prosecuting attorney, if thought advisable, and to report to the directors, suggesting the best course to be taken in the matter."

On the same day that this final agreement between the banks was entered into, Mr. Larson wrote a letter to the American Savings Bank & Trust Company of Seattle, referring to the escrow agreement for the purchase of appellant's stock by the respondent, which, in part, reads as follows:

"That since the execution and delivery of said agreement and the deposit with you in escrow of the $14,000, pursuant to the terms of the agreement, it has developed that a shortage in the cash assets of the Bankers Trust Company of $17,125 exists and did exist at the time of the making of the agreement herein referred to, by reason of the defalcation of one of the bookkeepers of the Bankers Trust Company by the name of McDonald, which fact was unknown to all parties to the agreement at the time of the making of the same. There may be other defalcations as yet undiscovered.

"Since the discovery of this defalcation just last night the board of directors of the Bankers Trust Company has been in session with the state bank examiner and his deputy, and resolutions have been passed modifying the terms of the agreement entered into whereby the Scandinavian-American Bank of this city was to take over the liabilities and assets of the Bankers Trust Company for the purpose of liquidating the same, at which meeting Mr. Heitman of this city, the local representative of Mr. James A. Murray, was present, representing Mr. Murray.

"In view of this changed condition, you and each of you are hereby notified not to deliver the cashier's check No. 24527, for $14,000, deposited under the terms of the agreement heretofore referred to, nor to endorse, negotiate or otherwise dispose of the same to James A. Murray or to any other person whomsoever until further notice from the undersigned, which will not be given until matters have been satisfactorily adjusted in view of the developments herein referred to. "Yours very truly,

"O. S. Larson, Manager."

Nothing having been heard from Mr. James E. Murray following the long distance telephone conversation had on the night of November 15, Mr. Larson, on November 20, acting in behalf of the respondent, wrote Mr. Murray as follows:

"This is to advise you that last Thursday evening, the 15th day of November, it was discovered that the liabilities of the Bankers Trust Company on individual account had been understated to the amount of $17,-166.68, and that there may be other discrepancies for which no adequate provision has been made, and that this condition was concealed from the said Jafet Lindeberg and that he had no knowledge of the same at the time of entering into the agreement above referred to. Upon the discovery of this shortage, we served the American Savings Bank & Trust Company at Seattle with legal notice, a copy of which we enclose, instructing them not to deliver, endorse, negotiate or in any

way dispose of the cashier's check for $14,000, which they are holding in pursuance of an agreement entered into between James A. Murray and Jafet Lindeberg, on November 13th. Friday morning, November 16th, the directors of the Bankers Trust Company, in pursuance of authority vested in them by a stockholders' meeting duly called and held, turned over to the Scandinavian American Bank all of the assets of the Bankers Trust Company for the purpose of paying the depositors of said bank by and with the approval of the Banking Department of the State of Washington, and in addition guaranteed and agreed to hold the Scandinavian American Bank of Tacoma harmless from any loss in case all of the assets of the said Bankers Trust Company should prove of less cash value than the established liabilities, contracts, debts and deposits of the said Bankers Trust Company.

"In view of the facts as enumerated above, said Jafet Lindeberg hereby refuses to accept from James A. Murray the said 1,519 shares of the capital stock of the Bankers Trust Company and denies that he is indebted to the said James A. Murray in any sum or sums whatsoever, and hereby demands the said James A. Murray to order the American Savings Bank & Trust Company at Seattle to return to the Scandinavian-American Bank of Tacoma the cashier's check for $14,000, now held by said American Savings Bank & Trust Company in pursuance of the escrow agreement between James A. Murray and Jafet Lindeberg, dated November 13th, 1917."

No response to this letter having been made by Mr. Murray, this action was brought, demanding a rescission and cancellation of the agreement to purchase appellant's stock; that the cashier's check be returned to the Scandinavian-American Bank, and that the stock of the Bankers Trust Company be returned to appellant. The trial court, after hearing the evidence, entered a judgment rescinding the contract and placing the parties in *status quo* as prayed for; from which judgment this appeal is prosecuted.

Appellant's principal contentions are that there was no mistake, in a legal sense, inducing the making of the contract sought to be rescinded; that the agreement for the sale of the stock and the agreement for the transfer of the bank's assets were interrelated and inseparable parts of one contract, which cannot be affirmed as to its benefits and rescinded as to its burdens.

We think it is elementary that, where there is a clear *bona fide* mistake regarding material facts, without culpable negligence on the part of the person complaining, the contract may be avoided and equity will decree a rescission. We take it that the true test in cases involving mutual mistake of fact is whether the contract would have been entered into had there been no mistake. *Stahl v. Schwartz,* 67 Wash. 25, 120 Pac. 856; 10 R. C. L. 296-299. We are clear that there was such a mistake here. The agreement of November 13 for the purchase of the stock was undoubtedly entered into by both parties in the belief that the books of the trust company spoke the truth as to its assets and liabilities, and presumably the contract would never have been entered into had respondents known the true facts. The two agreements, the first between appellant and respondent whereby the former sold to the latter his stock in the trust company, and the second whereby the Scandinavian-American Bank took over and liquidated the affairs of the trust company, were, we think, separate contracts, each distinct from the other. The first agreement, for the sale of the stock, was related to the second only in the sense that the appellant, as the dominating stockholder in the Bankers Trust Company, had used that fact to hold up the plan for the liquidation of its assets and the payment of its obligations until he had disposed of his stock, and no doubt the purchase of the stock by respondent moved the ap-

pellant to consent to the agreement to liquidate. However, the effect of even this relationship was completely lost upon the discovery of the defalcation and the refusal of the Scandinavian-American Bank to proceed with the liquidation contract as first made, the giving of the notice to all concerned, and the substitution of the new agreement of November 16 under which the liquidation was finally effected, which effectually rescinded the former agreement.

Appellant's agent, James E. Murray, was promptly notified upon the discovery of the defalcation and whether or not we accept the testimony of Mr. Larson and Mr. Heitman to the effect that he was then informed that Lindeberg would not purchase the stock, or that he was hesitating, still, as a man familiar with business affairs, he must have known that knowledge of this defalcation and the changed conditions would produce its effect and that the Scandinavian-American Bank might, and probably would, refuse to undertake the liquidation of the trust company under the terms of the agreement theretofore made between them which placed the liability caused by the defalcation upon it. He had opportunity, brief, it is true, to wire directions to the directors of the trust company as to what should be done under the changed conditions, but whether he did so or not, and without regard to appellant's position as the holder of the majority of the stock of the trust company, its directors had full legal power and authority to manage and direct its affairs and must be held to have properly entered into the modified agreement, made after the defalcation was discovered, for the liquidation of the trust company. The second agreement, made by the directors of the trust company on November 16, cannot be said to be a part of the agreement for the sale of the stock which

was executed three days before, and we see no reason, in view of the power of the directors to make the later agreement which was entered into after knowledge of the shortage, why the former agreement between the individuals, who are parties to the cause, should now be held to be a part of an agreement which was not even contemplated until two or three days after the agreement between the individuals was made.

Other points are raised and discussed by the appellant which, in view of the length of this opinion, we do not consider it necessary to discuss. We are clear that the parties entered into the agreement under consideration through mutual mistake of fact, from which equity will relieve, and that the contract between the individuals, parties to this suit, and the subsequent contract between the banks by which the affairs of the Bankers Trust Company were liquidated, were not so related that the performance of the latter contract will prevent the rescission of the former.

The judgment appealed from will be affirmed.

PARKER, C. J., MAIN, MITCHELL, BRIDGES, and FULLERTON, JJ., concur.

MACKINTOSH, J. (dissenting)—I cannot agree with the majority opinion in this case, one reason being that the contract of Lindeberg of November 13 to purchase Murray's stock in the Bankers Trust Company, and Murray's contract with the Scandinavian-American Bank to purchase certain assets of the Bankers Trust Company were, as testified to by every witness in the case, inseparable parts of one general agreement, and that Murray cannot be held to his bargain to assume the burdens and at the same time be denied the benefits. Lindeberg himself testified that the agreement was made by him to assist the Scandinavian-American

Bank, in which he was a large stockholder, and that his agreement to purchase Murray's stock, and the purchase by the Scandinavian-American Bank of the Bankers Trust Company, which involved the purchase in turn by Murray of certain of the Bankers Trust Company's assets, were parts of one transaction. He testified: "I would not have cared to purchase the stock without getting the assets. The purchase of the stock and the delivering of the assets went together naturally." This court has already held, in conformity with the general rule, that a party cannot ratify one part of a contract which is beneficial to his interest, and disaffirm that part which does not result in his benefit; that the rescission must be total. *Seattle Nat. Bank v. Powles*, 33 Wash. 21, 73 Pac. 887.

On November 16, after the discovery of the McDonald shortage, Lindeberg and the Scandinavian-American Bank did not elect to rescind, but in the absence of Murray, or any one acting in his behalf, they agreed to changes in the contract between the Bankers Trust Company and the Scandinavian-American Bank which did not modify the agreement of Murray to take up the unliquid assets of the trust company, and by November 20, the Scandinavian-American Bank had proceeded with the acquisition of the Bankers Trust Company's assets, which included $125,000 in cash which Murray then had on deposit in that institution, and had obtained possession of the deposit at Seattle of Murray's additional sum of $112,000 to complete the purchase of the assets of the Bankers Trust Company, and all this money was received by Lindeberg's institution before Murray was notified of the changed arrangement of November 16. The sum total of the transaction is that Murray has paid out $245,500 in cash, and in exchange therefor has received unliquid

assets of the Bankers Trust Company, under a modified agreement of which Murray was not advised, and, according to the majority opinion, the other parties to the contract now have a right to refuse to carry out the agreement to buy Murray's stock for the sum of $14,-000, which was a part of the consideration to pass to Murray in exchange for his agreement to take up the trust company's assets.

Furthermore, the mistake, if any there be, which the majority opinion holds is sufficient to justify a rescission is not such a mistake as would cause that result to follow. There is no question of rescission on the ground of fraud, as fraud is expressly disclaimed. The only mistake that is alleged is the lack of knowledge as to a fact which might have had some bearing on the making of the contract. Although Lindeberg might not have entered into the contract had he known of this shortage, Murray certainly would have made the contract had he known of the shortage. The common lack of knowledge is not a mutual mistake so far as the law is concerned. As was said in *Borden v. Richmond etc. R. Co.*, 113 N. C. 570, 18 S. E. 392, 37 Am. St. 632: "A unilateral error does not avoid a contract." And even though there may be exceptions to this rule, as was stated in *Bibber v. Carville,* 101 Me. 59, 63 Atl. 303, 115 Am. St. 303:

"While a court of equity may decree the rescission of a contract for a mistake which is unilateral, the power should not be exercised against a party whose conduct has in no way contributed to or induced the mistake, and who will obtain no unconscionable advantage thereby."

There being no fraud in the case, no mutual mistake, and no mistake which induced Murray, who has secured no unconscionable advantage by reason of the

contract, to make the contract, a court of equity will not rescind.

For the reasons stated, I dissent.

Holcomb and Hovey, JJ., concur with Mackintosh, J.