[No. 43103.     En Banc.     October 3, 1974.]

PUGET SOUND POWER & LIGHT COMPANY, *Respondent*, v. ALEX SHULMAN *et al.*, *Respondents*, BRITTANY HOUSE APARTMENT COMPANY *et al.*, *Appellants*.

*Hullin, Roberts, Mines, Fite & Riveland,* by *John A. Roberts* and *Dale Riveland,* and *William M. Robinson,* for appellants.

*Bogle, Gates, Dobrin, Wakefield & Long* and *Don Paul Badgley* and *Dale B. Ramerman,* for respondents Shulman.

ROSELLINI, J.—This action was originally brought against Alex Shulman, holder of title to a property known as the Brittany House Apartment, to recover rentals due the Puget Sound Power & Light Company on water heaters located in apartments on the property. The former owners were later joined, as was the contractor who built two buildings which are the subject of the dispute before the court on this appeal and who at the time of the trial held the sellers' interest by assignment. The matter was tried to the court. Its disposition of the light company's claim has not been challenged.

The appellants Jack Nettleship and Consolidated General Company were the former owners of the Brittany House Apartment. They will be referred to herein as the sellers. They and others who together, in the spring of 1968, were constructing seven apartment projects in King and Snohomish Counties, approached Shulman seeking a loan of $250,000 as additional interim financing to complete the construction of these buildings. Shulman would not agree to make them a loan directly, but did agree to purchase their interest in one of the apartments, the Brittany House, for $110,000 and to guarantee an additional loan of $150,000. The agreement of sale covering the Brittany House project provided that Shulman would take title immediately but would not be obligated to pay the purchase price until 10 new units which were under construction were completed.

There were already upon the property 35 units housed in two buildings, and these units were rented or available for rental at the time of the transaction.

The agreement provided that the new units would be constructed

in a good and workmanlike manner in accordance with said plans and specifications and [would] be of a quality and class comparable to similar improvements presently situated on the property.

The agreement further provided that if the seller should fail to construct and install and complete the additional improvements the purchaser would suffer damages which would be difficult to ascertain with particularity. Accordingly, it provided that, as liquidated damages, the purchaser would be entitled to retain all rents he had received with respect to the property and the seller should pay to the purchaser the further sum of $44,000 within 30 days after the date provided in the instrument for the completion of the construction of the improvements, and that thereupon the purchaser would reconvey the property to the seller by quitclaim deed. The purchaser was given the right, at his option, to elect to waive any claim for damages and to retain the property and pay the purchase price of $110,000. The agreement provided that a mortgage or deed of trust should be executed by the sellers in favor of the purchaser to secure the payment of the $44,000 liquidated damages.

The agreement referred to an existing interim mortgage and to a commitment covering a long-term mortgage to be substituted for the interim mortgage upon the completion of the new units. Shulman took the properties subject to these mortgages and did not expressly agree to assume them.

This agreement was dated July 17, 1968. On December 27, 1968, a supplemental agreement was executed. This agreement recited that it was made for the purpose of resolving disputes which had arisen as to whether the former agreement was being performed. Among other revi-

sions the purchase price was reduced from $110,000 to $90,000. The provision for liquidated damages was not altered.

Some months after the new buildings were built and ready for occupancy, Shulman, through his attorneys, notified the sellers that because of defects in the construction, he was exercising his option to demand payment of the liquidated damages. Thirty days passed, and the damages were not paid. Shulman continued in possession of the premises and continued to make the mortgage payments, using the rentals to the extent that they were available for that purpose, and was still in possession when this litigation was instituted.

In the meantime, the parties had continued to negotiate the terms and conditions for the obtaining of a loan, to be guaranteed by Shulman. Shulman acted as the sellers' representative in dealing with the lending agency, and an agreement was reached. However, it was then discovered that one of the major properties which was to serve as security was still subject to an interim loan, and that its completion date was not in sight, whereas the agreement had provided that upon the date the loan was disbursed, long-term financing should be in effect on that property. Long-term financing would not be available until completion of the project. During the next few weeks, Shulman endeavored to find a way to provide the loan in spite of this problem, and eventually succeeded in arranging a commitment. By this time, however, the sellers' financial situation had deteriorated to the point that they were forced to sell their interest in the properties to another financing institution, and they could not take advantage of Shulman's offer.

In disposing of the claim of Puget Sound Power & Light Company, the trial court was faced with the necessity of resolving the disputes between these parties. It was the theory of Shulman, adopted by the trial court, that his damages resulting from the failure to complete the new units to his satisfaction were greater than the purchase price. In fact, the trial court awarded Shulman a judgment

in excess of $90,000, and decreed that if that amount were paid within 30 days after the judgment was entered, Shulman should reconvey the property to the sellers, but that if the judgment were not paid, Shulman would be entitled to retain title to the property. In that event, the judgment would be reduced in the amount of the liquidated damages, and the sellers would remain obligated to pay Shulman the balance, which represented mortgage payments he had made that had exceeded the amount of rentals received upon the new units prior to the date of trial.

Error is assigned to the trial court's conclusion that the sellers' failure to pay Shulman the sum of $44,000 within 30 days from the date of demand constituted a separate and distinct breach of contract for which Shulman was entitled to damages, which included not only the liquidated damages plus interest but also the sums in excess of $3,066 per month which became due upon the underlying mortgage after the new units were built and ready for occupancy, which the court found to be in the amount of $35,227.

This conclusion was based upon the trial court's interpretation of the following provision of the sale agreement:

> [T]hat from and after the date of such conveyance and until such additional improvements shall be constructed and installed, the maximum monthly installments required to be paid upon said existing encumbrances or upon said new mortgage, as the case may be, shall not exceed $3,066.00 per month (including principal and interest), and that after such additional improvements shall be constructed and installed, the maximum monthly payments shall not exceed the monthly installments set forth in the aforesaid commitment attached hereto as Exhibit B; . . .

The monthly payments referred to in Exhibit B were in the amount of $5,249. The completion date provided in the agreement was February 28, 1970. However, the units were built, accepted by the long-term lender, and occupied by tenants on July 1, 1969. Shulman was required to make a $9,548.64 mortgage payment on February 1, 1969, and to pay $5,249 per month thereafter in order to avoid a default.

■ It appears certain from the language of the quoted provisions, read in the light of the circumstances and the contract as a whole, that the parties knew that when the new units were completed to the satisfaction of the long-term lender, the interim loan (payable on demand) would be replaced by the long-term loan (payable over a period of 25 years).

They also understood that the monthly payments would be increased when the new units were ready for occupancy, and that the rentals received would be available to apply against these payments. It is not clear whether the parties contemplated that, if the new units were completed in accordance with the specifications and were of the same quality and workmanship as the old units, the rentals realized from them could be expected to cover the increased payments. There was evidence that Shulman understood that income from this property would not always be sufficient to meet the mortgage payments. But we will assume that it was contemplated that the rentals would take care of these payments.

The evidence offered by Shulman, which was accepted by the trial court, tended to show that the materials used, particularly in details of finish and decoration, were inferior to those used in the old units, as a result of which and also due to other deficiencies a lower rent was charged and the vacancy factor was higher.

The damages awarded by the trial court represented the difference between the rentals actually received from the new units and the amount of the mortgage payments allocable to those units. While the method used to compute the actual loss attributable to reduced rentals may well have been proper, we believe the trial court erred in adding this element of damage to the liquidated damages provided in the contract. The loss of rentals resulted from the faulty construction of the units—and not from the failure to pay the liquidated damages. It was therefore covered by the liquidated damage provision, which by its terms was meant to compensate Shulman for any damage that he might suf-

fer by reason of the failure to complete the units in accordance with the terms of the contract.

It would appear that the provision warranting that the mortgage payments would not be increased before the completion of the new units was designed to protect Shulman from any undisclosed or additional interim mortgage obligations. The contract itself provided a remedy for the breach of this provision. In the event the mortgage payments were prematurely increased, Shulman was given the right, at his election, to terminate the agreement upon giving 10 days' written notice to the seller. He did not exercise this option.

The liquidated damage provision, by its terms, covered all damages which might flow from a failure to complete the additional units.

■ It is a basic rule of contract law that courts will not revise an agreement for the parties—or for one party, where the agreement itself is clear and unambiguous. Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed. *Chaffee v. Chaffee*, 19 Wn.2d 607, 145 P.2d 244 (1943); *accord, Mead v. Anton*, 33 Wn.2d 741, 207 P.2d 227, 10 A.L.R.2d 588 (1949).

We do not quarrel with the trial court's conclusion that the failure to pay the liquidated damages upon demand constituted a separate breach, but the remedy for that breach was foreclosure of the mortgage which was given to secure the payment of the damages. There was no provision in the contract that Shulman could retain title to the property, make the mortgage payments, and add to the liquidated damages any loss which he sustained in making such payments. The liquidated damage provision itself indicates that losses of this type were within the contemplation of the parties when they made their agreement, for its preamble reads:

> The parties further agree that considering the aforesaid amounts owing upon said existing encumbrances

upon said property or the principal amounts advanced upon said new mortgage, as the case may be, if Seller shall fail to construct, install and complete such additional improvements, purchaser will suffer damages.

■ The liquidated damage provision was intended to cover all losses resulting from the failure to complete the new units in accordance with the terms of the contract. The evidence showed that the actual damage suffered was equal to or in excess of the amount provided for liquidated damages, even though the liquidated damages amounted to almost half the revised purchase price of the sellers' equity. The trial court was justified in finding that the provision was a true damage provision, and not a penalty. *Jenson v. Richens,* 74 Wn.2d 41, 442 P.2d 636 (1968); *Underwood v. Sterner,* 63 Wn.2d 360, 387 P.2d 366 (1963). Such a provision, while it may not preclude an action for specific performance, effectively limits the amount of recovery in an action for damages at law. *Jenson v. Richens, supra.*

The trial court erred, therefore, in awarding damages in addition to those provided in the contract.

The facts of this case, viewed in the light of the contract provisions, present a situation which we believe is rather unique. Ordinarily, it would be expected that provisions for liquidated damages for construction defects would be designed to benefit the party who owns the building or who is purchasing it and intends to retain his ownership. Here, however, the liquidated damage provision is applicable, under the terms of the contract, only if the buyer decides to forego his right to purchase the property. He is being compensated not, as in the ordinary case, for receiving a property having a value less than that for which he bargained, but for having given his time and managerial attention to a property in the reasonable expectation of receiving future benefits which, because of the sellers' default, cannot be realized.

Thus the contemplated damages could not be ascertained by reference to the usual measure of damages for defective performance of a construction contract—that is, the cost of

correction if economic waste is not involved or, if there has been substantial performance, the difference between the value of the building as constructed and the value it would have had had it been built in conformance with the agreement. *Fuller v. Rosinski*, 79 Wn.2d 719, 488 P.2d 1061 (1971); *see* Annot., 76 A.L.R.2d 805 (1961). This conclusion is compelled because, according to the agreement, the damages were not payable at all if Shulman should elect to waive the defects and keep the property, and in that event he would be required to pay the entire purchase price.

As matters turned out, a development not covered by the express terms of the agreement occurred. Shulman elected to give up the property and take his damages. He did not waive the defects. But the sellers did not pay the liquidated damages within 30 days, as provided in the agreement. Payment of these damages was a condition precedent to their right to be restored to title and possession.

While the agreement did not expressly provide for this eventuality, it did provide security for payment of the liquidated damages. We think the only reasonable interpretation of the intention of the parties must be that Shulman could either relinquish title and possession to the sellers and foreclose the mortgage which secured the payment of the liquidated damages, or he could retain title to the property and pay the sellers the difference between the liquidated damages and the purchase price. Since he elected to retain the title and possession after 30 days had passed and the sellers had not paid the liquidated damages, he became obligated thereupon to pay the sellers the difference between the amount of the liquidated damages and the contract price. The trial court correctly held, however, that the sellers, having failed to pay the liquidated damages within the prescribed time, have lost the right to demand a reconveyance of the property.

The sellers have assigned error to findings which the trial court entered concerning the actual damages sustained by Shulman. The sellers admit that there were defects in the construction and that Shulman was damaged. The evidence

shows damages which equal or exceed the amount of the liquidated damages. Since only the latter are recoverable in this action, the findings complained of were not prejudicial.

It is contended that at least part of the consideration for the agreement to sell the Brittany House was the commitment to guarantee a loan, and that this agreement was breached. Upon the evidence, the trial court was justified in finding that Shulman performed his part of the agreement and that the sellers failed to meet the reasonable conditions imposed. The evidence showed that the parties agreed that Shulman would receive a fee for his efforts in securing a loan commitment for the sellers, and a portion of this fee was deducted from the purchase price of the Brittany House when the agreement was modified on December 27, 1968. There was ample evidence that he earned the fee, that he was ready, willing and able to perform, but that the sellers had placed themselves in a position where they could not take advantage of the loan offer which he procured.

The trial court did not make an express finding that Shulman had earned that portion of his fee which was deducted from the original purchase price when the supplemental agreement was signed. However, such a finding can be inferred from its finding that Shulman's undertakings were performed. Thus, if the two transactions were tied together, as the sellers have maintained, that circumstance alone does not justify a conclusion that the sale agreement is a nullity or that it should not be given effect according to its terms.

■ It is urged that the supplemental agreement was the result of duress or "business compulsion." The sellers stress the fact that they were in desperate financial condition when this agreement was made. There was no showing that their financial condition was in any way attributable to any act of Shulman. It was because of their financial difficulties that they sought him out and solicited his aid. In dealing with them, he was, of course, entitled to protect his own interests, as long as he did not engage in fraud or

overreaching. The Court of Appeals, Division One, Panel 1, in *Rosellini v. Banchero*, 8 Wn. App. 383, 387, 506 P.2d 866 (1973) (*rev'd upon another ground, Rosellini v. Banchero, 83 Wn.2d 268, 517 P.2d 955 (1974)*), stated the applicable principle accurately, in quoting from *W.R. Grimshaw Co. v. Nevil C. Withrow Co.*, 248 F.2d 896, 904 (8th Cir. 1957):

> In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities.

The mere fact that a contract is entered into under stress of pecuniary necessity does not constitute business compulsion. *Starks v. Field*, 198 Wash. 593, 89 P.2d 513 (1939). *See also Speckert v. Bunker Hill Ariz. Mining Co.*, 6 Wn.2d 39, 106 P.2d 602, 131 A.L.R. 125 (1940). *And see generally* 13 *Williston on Contracts* §§ 1601 *et seq.* (3d ed. W. Jaeger 1970).

The trial court did not err in refusing to find that the supplemental agreement should be invalidated on the ground that it was induced by business compulsion.

■ It is contended that the court should have allowed the contractor recovery for extras. No claim for these extras was made in this action and the issue was not presented to the trial court until the end of the trial. Under these circumstances, it cannot be said that the court erred in refusing to allow the issue to be injected when the trial was over.

The judgment is affirmed in part and reversed in part, and the cause is remanded with directions to enter a judgment in conformity with the views expressed herein.

The parties will bear their own costs on appeal.

HALE, C.J., FINLEY, HUNTER, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., and REA, J. Pro Tem., concur.

Petition for rehearing denied December 17, 1974.