[No. 1360–3.    Division Three.    June 21, 1977.]

SEATTLE–FIRST NATIONAL BANK, *Appellant*, v. KEN
EARL, ET AL, *Respondents*.

*Richard A. Derham* and *Davis, Wright, Todd, Riese & Jones,* for appellant.

*Ken Earl,* pro se, *Douglas Earl, Ries & Kenison, Ralph Kenison, Shine, Rein, Stiles, Cathcart & Urquhart, Patrick K. Shine,* and *John D. Urquhart, Jr.,* for respondents.

MUNSON, C.J.—What effect is to be given a rental escalation clause contained in a long–term lease where the index necessary to effectuate the escalation is nonexistent? The trial court held that the escalation clause was without effect and the trial court could not rewrite an unambiguous contract, except to the extent that the parties' subsequent conduct evidenced an agreement to escalate the rent an additional $52.50 per month. The Seattle–First National Bank, as trustee and lessor, appeals from this judgment. We find the nonexistence of the index upon which the parties agreed causes the escalation clause to be unenforceable at this time. We reverse and modify the judgment in part as it pertains to two of the lessees.

In 1958, Martin Penhallick placed in a living trust certain real property located in Moses Lake. The Seattle–First National Bank, along with other individuals, was named as cotrustee for the benefit of Mr. Penhallick's daughters. This property was leased by the trustees in 1958 to Messrs. Phil Herrmann, Robert Yerxa and Wally Edwards for a period of 49 years with an option to renew for an additional 20

years.[1] During negotiation of the lease, one of the issues was whether to include a rental escalation clause. Ultimately, the lessees agreed in principle to the inclusion of an escalation clause. The lessees sought to tie that escalation to a cost–of–living index for the Moses Lake area, but were advised by the trustees that no such index existed. The trustees then suggested they use a cost–of–living index for the City of Spokane. This suggestion was accepted.

The trustees retained counsel to draft the instrument. The lease was then approved by the negotiator for the trustees, his superior, the trust committee at the Spokane and Eastern Branch of the Seattle–First National Bank, consisting of four senior trust officers and two commercial loan officers, and ultimately by the trust committee of the Seattle main office. Only after approval by these various trust officers and committees was the lease submitted to the lessees for execution; lessees approved and signed the lease on June 14, 1958.[2] The clause in issue reads as follows:

> 2. As rental therefor, Tenants *agree to pay* Lessors, . . . the sum of *Three Hundred Fifty Dollars* ($350.00) *per month* payable in advance on the 15th day of each month during the term of this lease, . . . provided further, that the parties agree that at the end of each year during the term of this lease, such monthly *rent shall be increased* five per cent (5%) for each total of five per cent (5%) increase in the *cost–of–living figures for the City of Spokane, issued by the United States Bureau of Labor Statistics,* above the figures issued nearest to the 15th day of June, 1958.

(Italics ours.)

Subsequently these events occurred:

August 1960             Trustee wrote Messrs. Herrmann and Edwards advising them that a review

---

[1] In 1963, Mr. Edwards' leasehold interest was transferred to Mr. Earl.

[2] Coexistent with the execution of the prime lease, Mr. Herrmann and Mr. Edwards negotiated a motel franchise and construction contract. A portion of the property now houses a nationally franchised motel. Several years later, Mr. Earl successfully negotiated a Kentucky Fried Chicken franchise and after securing a loan and mortgage, erected a building to house the business.

of the labor statistics from the United States Bureau of Labor indicated that there had been no increased cost of living for the city of Spokane; hence no additional rent would be due.

February 1963    Mr. Earl acquired the Edwards' interest, which acquisition was approved by the trustee.

May 1963    The lease payments were apportioned between the lessees in an agreed partition decree.

December 1963    Representative of the trustee wrote the bureau requesting an update of cost–of–living statistics and learned there was no index for the city of Spokane.[3]

April 1964    Trust officer in Wenatchee, an attorney, inquired of Mr. Herrmann's counsel of the possibility of utilizing the cost–of–living index for the city of Seattle. A reply to his inquiry stated that you had "better use the Spokane Index, or Phil Hermann [*sic*] will have you in a law suit."

October and
November 1964    Wenatchee trust officer spoke personally with Mr. Herrmann but without reaching a conclusive agreement. Apparently Mr. Herrmann at one time leaned toward adoption of the Seattle index but ultimately rejected it. These conversations were preceded by a letter from a trust officer indicating the increased rental pursuant

---

[3]The Spokane Area Development Council, Inc., an independent nonprofit corporation, does compile some figures for cost of living for Spokane. This compilation is not the index referred to in this lease.

to the Seattle index as of June 15, 1963, would be $367.50. There was no response of record to that demand.

July 10, 1965   Mr. Herrmann died.

November 2, 1967   Wenatchee trust officer wrote Mr. Herrmann's widow asserting that the escalation clause was tied to the Consumer Price Index of the Bureau of Labor Statistics and demanded an amount of rent due based upon that index in excess of the base rental owing as of June, 1963.

Between 1967 and 1969, Mrs. Herrmann's attorney and the trustees' attorney reached an agreement on the alleged past–due rent based upon the United States Consumer Price Index and a remittance for the difference between the base rent and that amount was paid to the trustees. Counsel for trustees' attorney forwarded the remittance on July 8, 1969, stating in part:

It is also my understanding with Mr. Clifton Collins that you will deal directly with Mrs. Hermann [sic] in regard to any anticipated increase in rental due to the National Index going up in the future.

The monthly rental as a result of this settlement was established at $402.50, pursuant to the National Consumer Price Index, a $52.50 increase over the base monthly rental of $350. Thereafter, the following occurred:

September 7, 1972   The bank made additional demand for increased rent.

December 1972   Trustee's attorney notified all lessees demanding an increase in rent to the amount of $1,942.50 for the years of 1970, 1971 and 1972, based on the United States Consumer Price Index.

March 1973   The difference between $402.50 and the bank's claimed escalated rental was paid under protest and with the reservations of right.

Shortly after the increased rent was paid under protest in 1973, this action was commenced.

A multitude of legal theories are expressed by all parties to this action. The appellant trustee concedes, notwithstanding his 35 assignments of error, that there is only one issue involved: namely, the interpretation of the escalation clause. The respondents Earl and Yerxa cross–appeal contesting only that portion of the judgment which requires them to pay the difference between $350 and $402.50 per month in increased rent based on a compromise settlement between Mrs. Herrmann and the trustees.

█ It is a longstanding rule that courts cannot, and ought not, make a contract for the parties which they did not make for themselves or impose upon one party an obligation which was not assumed. *Puget Sound Power & Light Co. v. Shulman,* 84 Wn.2d 433, 439, 526 P.2d 1210 (1974); *Grant County Constructors v. E.V. Lane Corp.,* 77 Wn.2d 110, 121, 459 P.2d 947 (1969); *Nowoj v. Mulalley,* 1 Wn. App. 939, 943, 465 P.2d 194 (1970). This lease is a complete and accurate integration of the terms mutually agreed upon during negotiations. There is no basis for reformation because the lease accurately reflects the agreement of the parties. *Carlson v. Druse,* 79 Wash. 542, 140 P. 570 (1914). The language, "cost of living figures for the City of Spokane," is not ambiguous, thus the rules of construction relative to ambiguous instruments are not applicable. The parties are governed by the language of their agreement. *Grant County Constructors v. E.V. Lane Corp., supra.*

█ It is evident that these parties made a mistake when they presumed a cost–of–living index was in existence for the city of Spokane. The only cost–of–living index in this state upon which statistics are compiled by the Bureau of Labor Statistics is for the Seattle area. The trustee contends that the mistake is a mutual mistake, one involving both parties made independently by each party, requiring rescission of the lease. We disagree. If one party has no independent knowledge and accepted another's analysis

and opinion, the mistake is unilateral. *Finch v. Carlton,* 84 Wn.2d 140, 524 P.2d 898 (1974).

Here, the lessees acquiesced in the trustees' recommendation for the use of this particular index; lessees had no independent knowledge of its existence or nonexistence and accepted the recommendation of the trustees' representative. The lease was prepared by the trustees' attorney and approved by numerous representatives of the trustee bank before submission to the lessees for signature. The trial court's finding that there was a unilateral mistake is supported by substantial evidence.

The effect of finding a unilateral mistake is that the rent cannot escalate as long as there is no cost–of–living index compiled by the Bureau of Labor Statistics for the city of Spokane. If, during the term of the lease or its extension, such an index comes into existence, then the lessees shall be obligated to pay any increase in rent as established by that index in accordance with the terms of their agreement.

This court is not unmindful of the trustee's contention that the named index was a result of a mutual mistake, nor that: "the true test in cases involving mutual mistake of fact is whether the contract would have been entered into had there been no mistake. *Stahl v. Schwartz,* 67 Wash. 25, 120 Pac. 856; 10 R. C. L. 296–299." *Davey v. Brownson,* 3 Wn. App. 820, 824, 478 P.2d 258, 50 A.L.R.3d 1182 (1970), quoting from *Lindeberg v. Murray,* 117 Wash. 483, 201 P. 759 (1921). As noted, however, the equitable remedy, if not reformation, which we previously foreclosed, must be rescission. The court called for reargument in this case on the issue of rescission based on a unilateral mistake and/or unjust enrichment. Because of the numerous financial entanglements that have come into existence since the execution of the lease, including subleases and changes in lessees and the incurrence of encumbrances, it was apparent that any attempt to grant rescission would create more problems than it solved. The original unlawful detainer action was permitted to broaden its scope into seeking

equitable relief with the intention of resolving the controversy. Having invoked the powers of equity, this court was required to give close scrutiny to the result to be obtained through the invocation of those powers. *United States v. Systron–Donner Corp.,* 486 F.2d 249 (9th Cir. 1973). We have concluded that rescission would be inappropriate, based upon the following: (a) The trustees selected the index which was later adopted by the lessees; (b) the passage of the lease through the various offices of the trustee before its execution caused the lease to come under greater scrutiny than was attributed to the lessees; (c) the trustee's letter 2 years after execution of the lease that a review of the "labor statistics from the United States Bureau of Labor" indicated there had been no increase in the cost of living for the city of Spokane; (d) absence of further communication until April of 1964, when the trustees attempted to use the cost–of–living index for the city of Seattle; (e) a period of nearly 6 years had elapsed during which time: (1) a motel had been built on the property as anticipated by everyone at the time the lease was executed; (2) Mr. Earl, substituted as one of the lessees, subsequently has substantially encumbered the property in the furtherance of a fast–food franchise; (3) a further delay while the trustees attempted negotiations to substitute an index; and (4) suit not instigated until 1973, all factors contributing to make rescission an inappropriate remedy. Therefore, this court concludes, after considerable debate and deliberation, that it will not invoke its equitable powers to aid one who was the sole cause of the misfortune. *Biescar v. Czechoslovak–Patronat,* 145 Cal. App. 2d 133, 302 P.2d 104 (1956); *Thein v. Silver Inv. Co.,* 87 Cal. App. 2d 308, 196 P.2d 956 (1948); *B.F. Goodrich Rubber Co. v. Robertson,* 222 Mo. App. 510, 281 S.W. 75 (1926); *cf. Friedland v. Hollywood,* 130 So. 2d 306, 308 (Fla. Dist. Ct. App. 1961).

Two of the lessees cross–appeal as to the court's finding that all lessees were bound to pay the settlement figure of $402.50 per month, complaining that they had no notice of

any such settlement until after it had occurred and that neither Mrs. Herrmann nor her lawyer were their agents. We agree. There is no substantiation in the record that Mrs. Herrmann or her lawyer was acting as an agent for the other lessees at the time of the settlement. It is true that, as a result of the partition suit in 1963, all the lessees acknowledged the existence of the escalation clause, and that each lessee agreed to pay an equal share should the rent escalate pursuant to the lease terms. That agreement does not reach the issue here, *i.e.*, what index is to govern. The trustees and Mrs. Herrmann reached a compromise settlement based upon the National Consumer Price Index, but neither of the other lessees were parties to those negotiations or the settlement. Neither the Earls nor the Yerxas are bound by that agreement.

A person's conduct can be utilized to interpret his intent. *Henry v. Lind,* 76 Wn.2d 199, 204, 455 P.2d 927 (1969). Here, Mrs. Herrmann, in compromising the claim for back rent, did accept the utilization of the Consumer Price Index and did acknowledge the $402.50 per month figure. Therefore, she is bound by that amount. The trustee's attorney advised his clients when he conveyed the settlement funds that any future increase had to be reached independent of that settlement. This action was commenced to determine the amount of such an increase, if any.

We find that for the purpose of settlement and compromise of the then–existing trustees' claim Mrs. Herrman did agree to be bound to $402.50 per month based on the United States Consumer Price Index, but not to any further escalation as evidenced in part by the subsequent payments of only $402.50 and her continued protest to paying any additional amount. The increase was for the purpose of compromise and settlement of a claim in an estate; it did not bind Mrs. Herrmann for all future escalations, nor did it evidence an intent to continue to utilize that index as basis for future escalations. The trial court's finding, so far

as it affects Mrs. Herrmann and her estate, is supported by substantial evidence.

The judgment of the trial court is affirmed insofar as it compels Mrs. Herrmann to pay $402.50 as a monthly rental until such time as a cost–of–living index for the city of Spokane comes into existence; that portion of the judgment binding the Earls and the Yerxas to pay in excess of $350 per month is reversed until such time as the necessary cost–of–living index comes into existence. The trustee is directed to repay those monies, paid under protest insofar as they exceed the obligations determined by this decision.

GREEN, J., concurs.

McINTURFF, J. (dissenting)—This case concerns a lease for 49 years with an option for 20 years—69 years—with a rent escalation clause based upon a nonexistent index. To enforce the lease with no consideration for the diminishing value of the dollar, and the accepted fact of the rising cost of existing, borders on the unconscionable as it relates to the beneficiaries of a trust whose counsel made a mistake. The lease as originally drafted in 1958 was impossible of performance because the measure for escalation of the rent was nonexistent. Consequently, no contract was created at that time, see Restatement of Contracts §§ 501[4] and 456[5] (1932). At best, the lessees were month–to–month tenants. See RCW 59.04.020; Ryan v. Lambert, 49 Wash. 649, 96 P. 232 (1908). Neither the 1963 partition nor the 1969 Herrmann settlement altered that situation. They merely altered the method and amount for the payment of rent. If the bank terminates the tenancy, then the "tenants" are entitled to restitution in accordance with Restatement of

---

[4]"Mistake prevents the existence of a contract in accordance with the rules stated in §§ 51, 71, 456; and prevents the discharge of a duty or an effective assignment in accordance with similar rules."

[5]"Except as stated in § 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know."

Restitutions § 42(3) (1937),[6] and its attendant comment. The choice is the bank's—either to continue under the existing month–to–month tenancy at $402.50 per month for 69 years, or to terminate the tenancy and pay restitution to the tenants up to the value of the improvements.

Petition for rehearing denied August 15, 1977.

Review denied by Supreme Court February 17, 1978.

---

[6]"A person who has acquired an interest in land or chattels as the result of an agreement with the owner made under a mistake of fact and avoided by the owner is entitled to restitution for the value of services rendered in their preservation or in making appropriate improvements thereon."