**Robert W. BARNES, Jr., David C. Barnes, Susan B. Nielson, d/b/a The Barnes Family Partnership, Plaintiffs and Respondents,**

**v.**

**Richard C. WOOD and Marilyn P. Wood, d/b/a Fernwood Candy & Ice Cream Company, a partnership, Defendants and Appellants.**

No. 870483–CA.

Court of Appeals of Utah.

Feb. 10, 1988.

J. Michael Hansen (argued), Suitter, Axland, Armstrong & Hanson, Salt Lake City, for defendants and appellants.

Richard D. Burbidge (argued), Stephen B. Mitchell, Burbidge & Mitchell, Salt Lake City, for plaintiffs and respondents.

Before BILLINGS, DAVIDSON and GARFF, JJ.

## OPINION

BILLINGS, Judge:

This is an appeal from a judgment awarding respondents ("the Partnership") arrearages under a modified lease agreement and attorney fees. We affirm.

## FACTS

We view the facts in the light most favorable to the trial court's factual findings. *See Security State Bank v. Broadhead,* 734 P.2d 469, 470–71 (Utah 1987). On September 1, 1979, Jacqueline Barnes and Richard and Marilyn Wood ("the Woods") executed a ten-year lease agreement, whereby Barnes rented the Palace Ice Cream Store and 75% of the adjacent parking lot to the Woods.

Paragraph 3 of the lease fixed the monthly rent of the store at $750 but further stated "the monthly rental shall be adjusted upward or downward based upon the United States Cost of Living Index using August 1976 as a base, provided that the index must rise or fall 5% from the

base or prior adjusted level before adjustments in the rent are made."

Paragraph 4 of the lease agreement detailed responsibility for property taxes and included an escalation clause similar to the one articulated in paragraph 3: "[t]he Lessor shall pay the said property taxes annually, and in the event said taxes shall increase in any year in excess of the 5% ..., 75% of such increases shall be due the Lessor from the Lessee upon proof of payment of the same...."

Paragraph 10 of the lease agreement outlined the sublease of 75% of Barnes' leasehold interest of the adjacent parking lot to the Woods.

The Woods paid the stipulated monthly rent of $750 through August 1979. On September 6, 1979, Raymond Hintze, attorney for Jacqueline Barnes, sent a letter to the Woods, calling for an increase in the rent of the store and the adjacent parking lot pursuant to the escalation provisions of the lease. In his letter, Hintze requested an increase in the monthly rent for the building from $750 per month to $960 per month, and an increase to $100 per month for the parking lot, for a total payment of $1060 per month. Hintze also asked the Woods to pay $118.81, representing their 75% share of the increase in taxes. Hintze did not tender proof of payment of the tax increase. Hintze stated all these figures were based on the "cost of living figures" obtained from "the United States government." Although the Woods did not pay the requested taxes, they began paying the increased rent of $1060 per month.

On December 5, 1979, Gaylen Young, attorney for the Woods, sent a letter to Hintze, seeking to negotiate a reduction in the rent. In his letter, Young claimed the Woods were losing "several thousand dollars a year" on the Palace Ice Cream Store. Consequently, Young stated, with our emphasis added,

Fernwoods (the Woods) would like to work out some fair negotiation in regard to this lease with your client (Jacqueline Barnes) that would be fair. Perhaps a $900.00 per month *base* could be suggested, plus all increases in property taxes

over the 1979 *base*. In the event that something fair and reasonable cannot be arrived at, Fernwoods have no other alternative but to go to Court to try and obtain some relief.

While these rent negotiations were pending, Jacqueline Barnes was murdered; she bequeathed the Palace Ice Cream Store and her leasehold interest in the adjacent parking lot to her children, collectively known as the Barnes Family Partnership ("the Partnership").

On January 23, 1980, Hintze sent a letter to Young, stating Barnes' personal representative had agreed to reduce the rent to $1000 per month and forego the claim to the taxes which had accrued. The Woods began paying $1000 per month, commencing February 1, 1980, and continued to pay $1000 per month, without objection, until October 12, 1982. On October 12, 1982, the Partnership sent a letter to the Woods, demanding back rental payments and property taxes owed by the Woods pursuant to the lease agreement. (The Partnership was not aware of the January 23, 1980 letter from Hintze to the Woods until after suit was commenced.) The Partnership informed the Woods that as of November 1, 1982, total rent payment would be $1389.04 per month. The Woods refused to pay back rental payments and back property taxes, and refused to pay the increased rent. Consequently, the Partnership filed suit, alleging (1) the Woods had misrepresented the financial condition of Fernwood Ice Cream & Candy, thereby inducing Jacqueline Barnes to reduce the amount of the rent, and (2) the Woods were in breach of the "modified lease" and sought to recover deficiencies in rent and tax payments.

The case was tried to the court. At trial, the Woods contended the reduction in monthly rental to $900 represented the total rent due per month for the store for the remaining term of the lease. Alternatively, the Woods argued the acceptance of the $1000 per month rental payments by the Partnership operated as either an estoppel or waiver, barring the recovery of any arrearages. The Partnership claimed the reduction was for one year only as the $900

was intended to be a base rent from which future escalations would be calculated according to the escalation clause specified in the original lease. The Woods argued that the Partnership was not entitled to back property taxes because it failed to satisfy the condition precedent of proof of payment of the increase in property taxes. The Woods denied the fraud allegation.

The court found no fraud and determined the lease agreement had been modified. The court found the modified lease reduced the *base* rent to $900 per month upon which future escalations would be calculated according to the escalation provisions of the original lease. The court specifically determined the parties did not intend to abrogate the escalation clauses. Furthermore, the court held the Partnership was entitled to parking lot rentals and past due taxes pursuant to the lease. The court found the term "United States Cost of Living Index" was ambiguous and, over the Woods' objections, accepted extrinsic evidence to ascertain what the parties intended by the use of this term. The court determined the parties intended to use the "Consumer Price Index—All Urban Consumers" and therefore held future escalations would be calculated applying this index.

Subsequent to the trial and pursuant to an attorney fees provision in the lease, the Partnership submitted an affidavit seeking attorney fees. The parties had agreed that affidavits would be sufficient to prove attorney fees. In its affidavit, the Partnership sought $9850 in attorney fees and $526.34 in costs. The Woods objected to the affidavit because it did not differentiate between the time spent by counsel in enforcing the provisions of the lease agreement and the time spent in attempting to prove the fraud allegation. Counsel for the Partnership, in response, submitted an affidavit claiming that all time expended was reasonably necessary to prosecute the contract claim. At the conclusion of the hearing on the Woods' objections, the trial court reduced the amount claimed for attorney fees by one-third, thereby awarding the Partnership $6566.66 in attorney fees.

Several issues are presented on appeal. First, is the trial court's finding that the modification pertained only to the base rent and did not abrogate the escalation provisions of the lease agreement supported by substantial admissible evidence? Second, is the Partnership estopped or did it waive its rights to seek higher rent and recover alleged deficiencies in rent payments and tax payments by accepting payment of $1000 per month in total rent for nearly two and one-half years? Third, did the trial court properly admit extrinsic evidence to ascertain what the parties meant by the term "United States Cost of Living Index" and then correctly determine the parties meant to use the "Consumer Price Index—All Urban Consumers?" Fourth, did the court correctly award the Partnership arrearages in back property taxes, construing the phrase "proof of payment" as a covenant, rather than a condition precedent? Finally, was the award of attorney fees supported by adequate evidence?

## MODIFICATION

At trial, the parties agreed the original lease had been modified but disagreed as to the terms of the modified lease. The trial court, after admitting extrinsic evidence to determine the parties' intended agreement, found the modification did not eliminate the escalation provisions of the lease; it only modified the base amount (i.e., fixed it at $900 per month) upon which future escalations in rent would be calculated.

■ Whenever there is uncertainty or incompleteness concerning the parties' rights and duties under a contract, extrinsic evidence is permissble to ascertain those matters. *Craig Food Indus., Inc. v. Weihing,* 746 P.2d 279, 283 (Utah Ct.App. 1987). If the contract is ambiguous and the trial court bases its construction on extrinsic evidence of intent, then appellate review is strictly limited and the judgment will not be disturbed unless clearly erroneous. *See Wilburn v. Interstate Elec.,* 748 P.2d 582 (Utah Ct.App.1988); Utah R.Civ.P. 52(a). Based upon this standard we agree

with the trial court's construction of the modification.

The modification transpired after conversations and an exchange of correspondence between the parties and/or their attorneys. Initially, in a letter dated September 6, 1979, addressed to the Woods, Hintze, Barnes' attorney, informed the Woods the rent for the Palace Ice Cream Store and the adjacent parking lot was going to be increased to $1060 per month based on the escalation provisions of the lease. Hintze, applying the Consumer Price Index—All Urban Consumers obtained from the United States government, stated "the *base* rent for the Palace, effective September 1, 1979, is $960.00." (Emphasis added.) The Woods' attorney, in response to Hintze's letter, sought to reduce the base rent, stating "[p]erhaps a $900.00 per month *base* could be suggested...." (Emphasis added.) This letter never mentioned establishing a fixed rental rate for the duration of the lease term. Richard Wood testified he understood the term "base" to mean the rent from which future escalations would be calculated. Thereafter, on January 23, 1980, Hintze responded for Barnes' estate, stating $1000 per month would be acceptable. The Woods paid $1000 per month, without objection, until October 12, 1982 when the Partnership demanded arrearages.

The trial court concluded the parties intended, under the modification, to set a base rent of $900 per month from which future escalations in rent would be calculated according to the escalation clause in the lease. Given the consistent use of the term "base," and the parties' conduct, we find the trial court's construction is supported by substantial evidence.

### ESTOPPEL AND WAIVER

At trial, the Woods contended the Partnership's acceptance of their payment of $1000 per month in rent for twenty months, without objection, barred the Partnership from seeking alleged arreages in rent and taxes under either equitable estoppel or waiver. We disagree.

Waiver is the intentional relinquishment of a known right. *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983) (quoting *American Savings & Loan Ass'n v. Blomquist*, 21 Utah 2d 289, 292, 445 P.2d 1, 3 (1968)). To waive a right, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it. *Id.* The party's actions or conduct must evince unequivocally an intent to waive, or must be inconsistent with any other intent. *Id.* Whether a right has been waived is generally a question of fact and therefore we accord considerable deference to the finder of fact's determination. *See Northern Arizona Gas Serv., Inc. v. Petrolane Transport, Inc.*, 145 Ariz. 467, 702 P.2d 696, 705 (Ariz.Ct.App.1984); *Vogel v. Carolina Intern., Inc.*, 711 P.2d 708, 712 (Colo.Ct.App. 1985); *Mahban v. MGM Grand Hotels, Inc.*, 100 Nev. 593, 691 P.2d 421, 424 (1984).

The evidence does not demonstrate the Partnership relinquished a *known* right. The Woods failed to establish a primary element of waiver. At the time the Partnership commenced suit, it had no knowledge the Woods were paying rent according to the modified lease. The trial court reasonably concluded the Partnership acted diligently in sending the Woods the October 12, 1982 letter, seeking deficiencies in rent and tax payments, in view of Jacqueline Barnes' untimely death and the length of time that lapsed before her personal representative deeded the property interests to the Partnership. The trial court's conclusion that the Partnership did not waive the escalation provisions is not clearly erroneous. Utah R.Civ.P. 52(a).

Estoppel is a different doctrine than waiver. The elements of estoppel are: "conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct." *Blackhurst v. Transamerica Ins. Co.*, 699 P.2d 688, 691 (Utah 1985) (quoting *United American Life Ins. Co. v. Zions First Nat'l Bank*, 641 P.2d 158, 161 (Utah 1982)).

■ In the present case, the Woods failed to establish what "detriment or damage" they would suffer if the Partnership is now permitted to recover arrearages and to increase the rent according to the modified lease. At trial, the Woods argued they would be damaged to the extent they would now have to pay overdue rent and taxes. The trial court found no detriment and, on review, we fail to understand how this could constitute the "detriment or damage" contemplated under the doctrine of estoppel. Rather, the Woods are simply obligated to pay the amount they contractually agreed to pay. Consequently, we do not believe the trial court's finding, that the Woods were not prejudiced by the Partnership's delay in making the claims for arrearages in rents and taxes, is clearly erroneous. Utah R.Civ.P. 52(a).

### PARKING LOT SUBLEASE

Similarly, the Woods argue the Partnership is barred, under either equitable estoppel or waiver, from seeking back rent for the parking lot sublease. The trial court held the Woods liable for $4718.82 in back rent under the parking lot sublease and further held they were obligated to pay 75% of the lease rate charged to the Partnership. We uphold the trial court's determination for the reasons previously stated.

### UNITED STATES COST OF LIVING INDEX

The Woods contend the trial court erred by admitting extrinsic evidence to ascertain what the parties meant in using the term "United States Cost of Living Index," in the original lease and, based on this evidence, concluding the parties intended to use the "Consumer Price Index—All Urban Consumers." The Woods argue that "United States Cost of Living Index" is not an ambiguous term; therefore, extrinisic evidence as to the intended meaning of this term was improperly received into evidence by the trial court.

Paragraph 3 provided escalations would be based upon the "United States Cost of Living Index." At trial, the court concluded since no index with exactly that name existed, the term was ambiguous as a matter of law and consequently admitted extrinsic evidence to ascertain which index the parties had agreed to use. The court concluded the. parties intended to use an index applicable to the United States as a whole, not excluding any items or sub-regions, and thus determined the parties intended to and had in fact used the "Consumer Price Index—All Urban Consumers."

■ We acknowledge that courts cannot rewrite a transaction to include terms it believes are fair. *Cunningham v. Cunningham,* 690 P.2d 549, 552 (Utah 1984). Here, however, the court did not rewrite the agreement; rather, it admitted extrinsic evidence to determine what the parties intended by the use of the term "United States Cost of Living Index." *See Union Bank v. Swenson,* 707 P.2d 663, 655 n. 1 (Utah 1985).

■ The trial court's finding that the parties intended to use the escalation index titled "Consumer Price Index—All Urban Consumers" is consistent with the evidence at trial. First, the Woods acquiesced in the original demand to increase rent to $1060 per month, when this increase was described as based on "cost of living figures" obtained from the "United States government" and was determined by using the Consumer Price Index—All Urban Consumers. The Woods continued to pay this amount until Jacqueline Barnes agreed to reduce the base rent. Second, Richard Wood testified he assumed at the time the lease was executed that an index covering the United States as a whole, not excluding any items or covering any sub-regions, existed and was the index agreed upon. We cannot say the trial court erred when it determined the Consumer Price Index—All Urban Consumers comported with the parties' intentions at the time the lease was executed. Furthermore, the use of the term United States Cost of Living Index in the context of this case can be described merely as a general description of the index to be used rather than the name of a specific index.

■ On appeal, the Woods cite two cases which have held index provisions in leases were too indefinite to enforce. We find these cases factually distinguishable from the instant case.

In *Seattle–First Nat'l Bank v. Earl*, 17 Wash.App. 830, 565 P.2d 1215 (1977), the lessors and lessees disputed the amount due under an escalation provision contained in their lease. The lease specified the escalation in rent would be based on the "cost-of-living figures for the City of Spokane, issued by the United States Bureau of Labor Statistics...." The court found both parties intended to use a Spokane index and were unaware no such index existed. Consequently, the court held as long as there was no cost-of-living index compiled by the Bureau of Labor Statistics for the City of Spokane the rent could not be escalated as there was no way to enforce the agreement of the parties. *Id.* 565 P.2d at 1219.

Here, unlike the parties in *Seattle-First Nat'l Bank*, the parties did not intend to use a specific cost of living index which did not exist. Rather, the lease mislabeled the intended index using a general term. The parties intended to use and in fact used an index covering the United States as a whole without excluding any items or sub-regions, which, in substance, is the Consumer Price Index—All Urban Consumers.

The Woods also cite *Johnston v. First Nat'l Bank & Trust Co. of Joplin*, 624 S.W.2d 500 (Mo.Ct.App.1981), as authority supporting their argument that the trial court erred in determining the parties intended to use the Consumer Price Index—All Urban Consumers. In *Johnston*, the landlord and tenants executed lease agreements which escalated future rents according to the Consumer Price Index, U.S. City Average. The escalation provision did not specify which category of the Consumer Price Index was to be applied in calculating the rental increase. In *Johnston*, plaintiff Vogel, who paid according to the disputed index, was held to be bound by that decision. With respect to the remaining plaintiffs in *Johnston*, who did not acquiesce to the landlord's demand for rent increases,

the court held the escalation provision basing increases in rent on the Consumer Price Index, U.S. City Average was too indefinite to enforce because this index contains several separate categories. The record developed at the trial did not demonstrate that there was agreement as to which category was intended.

Here, as plaintiff Vogel in *Johnston*, the Woods acquiesced to Barnes' demand for an increase in rent and accordingly began paying $1060 per month. As in *Johnston*, the parties' conduct supports the conclusion that the Woods adopted the "cost of living figures" obtained from "the United States government" as Hintze stated in his September 6, 1979 letter. Moreover, in *Johnston*, there was no indication as to which category of the Consumer Price Index the parties intended to use. Here, as previously discussed, the evidence supports the trial court's finding that the parties intended to use an index that covered the United States as a whole, not excluding any items or sub-regions. The Consumer Price Index—All Urban Consumers fairly comports with those intentions.

## PROOF OF PAYMENT OF TAX INCREASES

The Woods contend the trial court erroneously awarded the Partnership back property taxes. They argue they were not obligated to pay the taxes because the Partnership failed to tender proof of payment before trial, a condition precedent to the Woods paying their share.

> The relevant clause of the lease provides:
> The Lessor shall pay the said property taxes annually, and in the event the said property taxes shall increase in any year in excess of [5% over the taxes for the year 1976], 75% of such increase shall be due the Lessor from the Lessee *upon proof of payment of the same....*

(Emphasis added.)

■ The Woods do not dispute that the Partnership paid the increased taxes; they merely complain they did not receive proof of this payment before trial. The case law overwhelmingly favors the construction of a promise as a covenant as

opposed to a condition precedent when the language is ambiguous. *Logghe v. Jasmer*, 686 P.2d 694, 698 (Alaska 1984); *Watson Constr. Co. v. Reppel Steel & Supply Co., Inc.*, 123 Ariz. 138, 598 P.2d 116, 118 (Ct.App.1979); *Ide v. Joe Miller & Co.*, 703 P.2d 590, 591 (Colo.Ct.App.1985). The trial court's interpretation of the proof of payment of taxes as a covenant rather than a condition precedent is supported by these authorities.

## ATTORNEY FEES

Finally, the Woods contend the trial court erred in its calculation of attorney fees, arguing the court's figure is not based on the requisite evidentiary foundation.

The parties stipulated that proof of attorney fees and costs could be established by affidavit. Counsel for the Partnership submitted an affidavit delineating the hours expended, the agreed billing rate, the work performed, and that the work was necessary and the rate reasonable. Counsel sought $9850 in attorney fees and $526.34 in costs for "the prosecution of this claim." Counsel for the Woods objected to the affidavit, contending the affidavit failed to apportion the time expended in prosecuting the breach of contract claim and the time expended in prosecuting the unsuccessful fraud claim. Counsel for the Partnership responded to this objection by sworn affidavit, as agreed, claiming all of the work done was required to prosecute the breach of contract claim as the evidence was overlapping. After considering the arguments of counsel and the submitted affidavits, on October 15, 1985, the court reduced the amount requested by counsel by one-third and awarded $6566.66 in attorney fees.

"[C]ontractual liability for payment of attorney's fees extends only to the amount necessary for the enforcement of the contract." *Nelson v. Newman*, 583 P.2d 601, 604 (Utah 1978). Moreover, "[i]t is well established that to justify a finding of a reasonable attorney's fee, there must be evidence in support of that finding.... It is beyond dispute that an evidentiary basis is a fundamental requirement for establish-

ing an award of attorney fees. It follows, therefore, that an award made without adequate evidence to support it constitutes an abuse of discretion and must be overruled...." *Paul Mueller Co. v. Cache Valley Dairy Ass'n*, 657 P.2d 1279, 1287 (Utah 1982).

Here, the Partnership sought not only to enforce the modified lease, but also to establish the Woods had perpetrated a fraud in inducing Barnes to agree to the modification. Under *Nelson*, discussed *supra*, the Partnership can recover attorney fees only for the amount necessary to enforce the modification. *Nelson*, 583 P.2d at 604. Counsel for the Partnership submitted detailed affidavits, as agreed, delineating and claiming all the time expended was reasonably necessary to pursue the contract claim. The trial court, after considering the affidavits and listening to counsels' arguments, and after personally observing the trial upon which the claimed attorney fees were based, determined that $6566.66 was a reasonable fee under the circumstances.

Trial courts have wide discretion in determining reasonable attorney fees provided there is evidence to support the amount awarded. *Jenkins v. Bailey*, 676 P.2d 391, 393 (Utah 1984). Here, there was adequate evidence to support an even greater amount than that awarded by the trial court, but we cannot say the trial court's reduction of the fees constituted an abuse of its discretion.

Affirmed.

DAVIDSON and GARFF, JJ., concur.