Burton W. DUENKE, Trustee of the
Burton Walter Duenke Living
Trust, Plaintiff–Respondent,

v.

Herman L. BRUMMETT, et al.,
Defendants–Appellants.

No. 16793.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 3, 1991.

Kenton E. Knickmeyer, David A. Stratmann, Thompson & Mitchell, St. Louis, for defendants-appellants.

Albert Henry Hamel, Michael W. Silvey, Clayton, William Icenogle, Icenogle & Icenogle, Camdenton, for plaintiff-respondent.

FLANIGAN, Chief Judge.

This appeal involves 21 leases in which plaintiff is lessor and the defendants, respectively, are lessees. Each lease contained a rental clause which included the following language:

"All the provisions of this lease shall be effective during any renewals or extensions thereof, except that the rental from time to time shall be increased to reflect the increase, if any, in the cost of living based on the United States Bureau of Labor Statistics Living Standard Index in effect at the time this lease was executed."

The problem is that there is no index entitled "United States Bureau of Labor Statistics Living Standard Index." (Except where the quoted words are set out in full, this opinion will refer to them as "the misnamed index.")

Lessor's petition sought a declaratory judgment defining the rights of the parties, and also sought relief by reformation of the leases. Prior to the trial, the defendants attempted unsuccessfully to obtain an order of the trial court treating the action as a class action under Rule 52.08.[1]

The trial court, sitting without a jury, received in evidence a written "Stipulation of Parties," setting forth certain agreed facts. Both sides introduced oral testimony.

Beginning in 1917 and continuing at least through the instant trial, the United States Department of Labor published an index entitled "U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index of Urban Wage Earners and Clerical Workers—U.S. City Average, All Items." This index is sometimes referred to as the CPI–W. The CPI–W is representative of the buying habits of 32 percent of the non-institutional population of the United States.

In 1978 the United States Department of Labor published, and continues to publish, an index entitled "U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index for all Urban Consumers, U.S. City Average, All Items." This index is sometimes referred to as the CPI–U. The CPI–U is representative of the buying habits of about 80 percent of the noninstitutional population of the United States. The CPI–U takes into account the buying patterns of professional and salaried workers, part-time workers, the self-employed, the unemployed, and retired people, in addition to wage earners and clerical workers.

The trial court found the issues generally in favor of the lessor and against the lessees, and entered an order reforming the leases. Those leases which were executed before 1978 were reformed so as to refer to the CPI–W as the basis for rent adjustments. Leases executed in 1978 or later were reformed so as to refer to the CPI–U for rent adjustment. Defendants appeal.

Defendants present four points. Those points, stated generally, are that the trial court erred: (1) "in considering extrinsic evidence" regarding the meaning of the misnamed index because the misnamed index is not ambiguous; (2) in reforming the leases with respect to 6 of the 21 leases involved in this appeal because rent escalations paid under those 6 leases were made under protest, the protest having been made prior to or contemporaneously with paying the rent following the first notice of

1. All references to rules are to Missouri Rules of Court, V.A.M.R.

escalation; (3) in reforming the leases because there was no mutual mistake as to whether the misnamed index was a proper description of the index to be used because lessor, when each lease was executed, knew that the misnamed index was not the index which he intended to use; (4) in denying defendants' motion to certify this action as a class action on behalf of all present and former leaseholders under Rule 52.08.

The stipulation of the parties, in addition to setting forth the background facts previously stated, contained facts set forth in the following 9 paragraphs:

1. Plaintiff at all times acted in his capacity as Trustee of the Burton Walter Duenke Living Trust. A portion of the corpus of the trust consists of real estate generally known as Tan–Tar–A Estates, all of which is located in Camden County, Missouri, and in which each of the defendants has or at one time had a leasehold estate.

2. There are approximately 347 buildings constructed on separate leased parcels on a portion of Tan–Tar–A Estates. The trust, through plaintiff trustee, entered into separate leases with various persons and entities, including each of the defendants, leasing to each of said lessees the parcel of real estate upon which each respective lessee's building is or was situated. Said leases are for an initial term of 20 years with two successive 10–year renewal options and thereafter two 5–year renewal options, all at the option of the lessee, thereby granting to each lessee, at his option, a 50–year lease.

3. Each of said leases provides for a fixed annual rental (hereinafter "base rental") payable quarterly, subject to increase or decrease as provided in said leases as follows:

Article 2 reads, in pertinent part:

"... and Lessee covenants and agrees to pay the Lessor the total sum of _____ Dollars ($_____) subject, however, to the cost of living increase, if any, herein provided payable quarterly in advance * * * "

Article 5 reads, in pertinent part:

"If Lessee shall faithfully keep and perform all of the covenants and agreements required by him in this Indenture of Lease, and if there is no default, Lessee may renew this lease for _____ successive ten (10) year terms and thereafter for _____ successive five (5) year terms. All the provisions of this lease shall be effective during any renewals or extensions thereof, except that the rental from time to time shall be increased to reflect the increase, if any, in the cost of living based on the United States Bureau of Labor Statistics Living Standard Index in effect at the time this lease was executed. The rental shall be increased or decreased by the same percentage as the increase or decrease in said Index, provided further, however, the said rental shall in no event be less than the rent herein stated for the primary term of this lease. If said Index shall no longer be published, then another Index generally recognized as authoritative shall be substituted by agreement; and if the parties should not agree, such substituted Index shall be selected by the then Presiding Judge of the Circuit Court of Camden County, Missouri, upon the application of either party. If Lessee shall not give written notice to Lessor at least three (3) months prior to the termination of the original term and before each successive renewal, it shall be deemed that said renewal shall become effective.

"On the anniversary date three years from the commencement date of this lease, Lessor and Lessee shall determine as of that time whether or not there has been a cost of living increase, as herein contemplated; and in such event, said rent shall be adjusted accordingly. Thereafter, the cost of living increase will be reviewed every three years on the anniversary date of this lease, during the term of this lease, and any renewals or extensions thereof."

4. Each of the defendants' separate leases have been or were in full force and effect for more than three years.

5. The first Tan–Tar–A land lease rental adjustment took place on June 14, 1972. The index used to calculate such adjust-

ment, and later adjustments until February 26, 1978, was the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index of Urban Wage Earners and Clerical Workers—U.S. City Average, All Items, ("the CPI–W"). On February 26, 1978, and at all times thereafter the index used to calculate rental adjustments was the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index of All Urban Consumers, U.S. City Average, All Items ("the CPI–U").

6. Lessor, at all times in calculating rental adjustments under the leases, acted in a uniform and consistent manner with regard to all present and former leases. In all rental adjustments from the beginning to the present time the lessor, through his representatives, advised each of the lessees, including the defendants, in writing that such adjustment was based upon the U.S. Department of Labor Consumer Price Index and a copy of the index used to calculate the rental adjustment as set forth in the preceding paragraph for the month in which the adjustment was made, as well as a copy of said index covering the period in which each lease commenced, was sent to each defendant to enable each to verify the basis for the rental adjustment and how the increased rental was computed and charged, copies of which are attached hereto and incorporated herein as Exhibits 2 to 24,[2] inclusive. The aforesaid index is the index which has been used without exception from the beginning to the present time by the trustee for all of the leases in effect at Tan–Tar–A Estates, in computing the rental adjustments under said leases.

7. From 1917 until 1978, the United States Department of Labor, Bureau of Labor Statistics, published an index entitled Consumer Price Index for Labor, Wage Earners and Clerical Workers (CPI–W), sometimes referred to as the "Cost of Living Index." From and after 1978, the United States Department of Labor, Bureau of Labor Statistics, expanded the aforesaid Consumer Price Index to include all urban consumers. The All Urban Index (CPI–U), introduced in 1978, is representative of the buying habits of about 80 percent of the non-institutional population of the United States compared with 32 percent represented in the CPI–W. The All Urban Consumers (CPI–U) takes into account the buying patterns of professional and salaried workers, part-time workers, the self-employed, the unemployed, and retired people, in addition to wages earners and clerical workers.

8. Insofar as the parties are able to determine, the United States Bureau of Labor Statistics has not published an index entitled United States Bureau of Labor Statistics Living Standard Index.

9. As long as the Consumer Price Index, All Urban Consumers, All Items, U.S. City Average (CPI–U) shall be published, unless directed otherwise by court order, lessor intends to continue the aforesaid procedure to adjust the rental under each separate lease agreement from time to time to reflect the increase or decrease, if any, in the cost of living during the term of each lease and any renewals thereof. However, if said index shall no longer be published, then the lessor intends that another index generally recognized as authoritative shall be substituted by agreement between lessor and lessee; and if such parties cannot agree, such substituted index shall be selected by the then Presiding Judge of the Circuit Court of Camden County, Missouri, upon the application of either lessor or lessee.

Defendants' brief says: "Each of the defendants has paid rent in accordance with the invoices issued by lessor. Defen-

---

**2.** The mentioned exhibits show the record of rent escalations and rent payments under the 23 leases involved in the trial court. The lessees in two of those leases did not join in this appeal.

Unlike the other leases, providing for rental adjustments every three years, the lease in which Estate 100 Partnership was lessee did not provide for rental adjustments until after the first 20 years.

With respect to the 21 separate leases involved on this appeal, only 4 lessees (including Estate 100 partnership) protested the initial triennial escalation. With respect to the other 17 leases, 11 lessees paid 1 escalation with no protest, 1 lessee paid 2 escalations with no protest, 4 lessees paid 3 escalations with no protest, and 1 lessee paid 5 escalations with no protest.

No protest was made prior to July, 1980.

dants Burkhart, Merton, Simpson, Wertz-berger, Johnson and Estate 100 Partnership each protested, in writing, either prior to or contemporaneously with paying the rental following the receipt of their first escalation notice."

There is no significant factual dispute. In addition to the facts which were stipulated, the trial court made these findings:

(a) Plaintiff, by and through his Tan–Tar–A Estates sales representatives and sales brochure used routinely in the promotion of sales of homes and leases of lots in Tan–Tar–A Estates, informed the defendants that there would be periodic reviews and rental adjustments every three years during the terms of the leases to reflect the increases or decreases in costs of living based upon a cost of living index.

(b) There is no United States Bureau of Labor Statistics Index published that is entitled "United States Bureau of Labor Statistics Living Standard Index." There is no evidence that an index so entitled has ever been published by the United States Bureau of Labor Statistics.

(c) Plaintiff included the phrase "United States Living Standard Index" (sic) in the individual leases which are the subject of this action. That phrase constitutes a general descriptive reference to a cost of living index published by the United States Department of Labor, Bureau of Labor Statistics.

(d) Plaintiff and defendants understood and intended, at the times of execution of the respective leases, pursuant to the uniform terms of those leases, that periodic rental adjustments would be made to reflect increases or decreases in the cost of living.

The trial court also made the following "Conclusions of Law":

(1) The reference in the subject leases to the United States Bureau of Labor Statistics Living Standard Index is ambiguous as a matter of law and extrinsic evidence is admissible to ascertain which index the parties agreed to use.

(2) By a preponderance of the credible evidence, plaintiff established that the parties to the respective leases intended to determine periodic rental adjustments every three years (except for the Estate 100 Partnership lease which did not provide for a rental adjustment until after the first twenty years), based upon increases or decreases in cost of living as reflected by a cost of living index published by the United States Department of Labor, Bureau of Labor Statistics.

(3) Defendants who are assignees under their respective leases are contractually bound by all provisions contained within their respective leases.

(4) By executing their respective leases, the lessors and lessees agreed to review and adjust the rentals every three years (except for the Estate 100 Partnership lease which did not provide for a rental adjustment until after the first twenty years). The negotiations which led to the executions of the respective leases were clear that this was what the lessor and the respective lessees intended. The purpose of the rental adjustments was to reflect the increases or decreases in the costs of living over the terms of the respective leases (including extensions thereof) as determined by a cost of living index. The reference to the United States Bureau of Labor Statistics Living Standard Index does not describe a cost of living index agreed to by the respective lessees and plaintiff for the purpose of effectuating their intentions to provide for rental adjustments based upon an established cost of living index.

(5) The rental adjustments for the individual leases executed before 1978 are, and at all times prior hereto have been, required to be calculated based upon the Consumer Price Index for Labor, Wage Earners and Clerical Workers (CPI–W) for the reason that the CPI–W existed at the times those leases were executed and was the index initially used to calculate rental adjustments for those leases. The CPI–W has, at all times thereafter, continued to be published. It (the CPI–W) continues to be the index required to be used for the calculation of rental adjustments, pursuant to the terms of the leases executed before 1978, and will continue to be the index

required for use in calculating rental adjustments for those leases unless that index "shall no longer be published." The CPI–W reasonably reflects changes in costs of living which occurred from and after the dates of execution of those individual leases executed before 1978.

(6) The rental adjustments for the individual leases executed in 1978 and thereafter have, at all times, been calculated based upon the Consumer Price Index, All Urban Consumers, U.S. City Average, All Items (CPI–U). That index existed at the times those leases were executed and was the index initially used to calculate rental adjustments for those leases. It has, at all times thereafter, continued to be published. It (the CPI–U) continues to be the index required to be used for the calculation of rental adjustments, pursuant to the terms of the leases executed in 1978 and thereafter, and will continue to be the index required for use in calculating rental adjustments for those leases unless that index "shall no longer be published." The CPI–U reasonably reflects changes in costs of living occurring from and after the dates when the individual leases executed in 1978 and thereafter were executed.[3]

Defendants' first point is that the trial court erred in considering extrinsic evidence concerning the meaning of the contractual language, "the United States Bureau of Labor Statistics Living Standard Index" because (a) the term is not ambiguous, and (b) paragraph 14 of each lease requires that extrinsic evidence of the parties' intentions be ignored.

In support of (a), defendants argue:

"The juxtaposition of the general descriptive phrase 'increase, if any, in the cost of living based upon ...' with the definite article 'the' followed by the proper noun 'United States Bureau of Labor Statistics Living Standard Index' in the text of each of the leases makes it clear that the parties' reference is to a specific index having a particular name: the 'United States Bureau of Statistics Living Standard Index.' An ambiguity would exist in this circumstance only if there are two or more indices denominated by that proper noun."

Defendants also argue:

"Each of the land leases makes reference to a specific index, 'the United States Bureau of Labor Statistics Living Standard Index'—not to a general term which could mean any one of a number of indices. Reliance upon extrinsic evidence was not necessary in order to determine the party's rights under the lease, and the parties provided by their contracts that it should not be considered. Therefore, this court should enforce the leases as written and hold that Mr. Duenke is only entitled to escalate rents based upon changes in the cost of living as measured by 'the United States Bureau of Labor Statistics Living Standard Index.' Because that index does not exist, the rent escalations imposed by Mr. Duenke were clearly improper [and] the appellants are entitled to a refund of all rents paid in excess of the base rent provided for in their leases."

Review of this nonjury case is governed by Rule 73.01 as construed in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses. Rule 73.01(c)(2). The judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or erroneously applies the law. *Murphy,* at 32[1–3].

---

**3.** The court entered judgment on each of the parties' claims based upon those findings, awarding damages to those appellants who entered into leases prior to 1978 and who paid rent escalations based on the CPI–U from 1978 to the time of trial, rather than the CPI–W as ordered by the court. Those damages were as follows: Martin, $154.36; Estate 100 Partnership, $116.85; Johnson, $145.63; Four Ple' Coalition, $9.03; Ellsworth Briehan Building, $232.69; Hogan, $294.74; John J. Connell Company, Inc. and Turek, $320.66; Petrol Properties, Inc. and Ernest Jack Webster, Jr., $14.94; Robert Bodine, $306.93; DeFraties, $61.58.

Lessor did not appeal with respect to any of the foregoing awards.

■ To justify the equitable relief of reformation on the ground of mistake, the burden is on the party seeking that relief, here the lessor, to show by clear and convincing evidence that the instrument did not express the agreement of the parties to it by reason of their mutual mistake. *State v. Schwabe*, 335 S.W.2d 15, 19 (Mo. 1960); *Walters v. Tucker*, 308 S.W.2d 673, 679[7] (Mo.1957).

■ It is the province of a court to enforce contracts, not to make or alter them, but it is the duty of the court to enforce the contract that was really made, and when by mutual mistake a contract is not expressed in such terms as have the force and effect that the parties intended, it is the clear duty of the court to correct the mistake. *Walters*, at 675. Courts of equity have exerted the power to reform an instrument so as to make it speak the real agreement made between the parties in those cases where, because of the mistake or inadvertence of the scrivener, the writing failed to do so. However, a mistake affording ground for the relief of reformation must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. *Id.* See also *Schwabe* at 19.

■ It was not necessary that lessor, as the party seeking reformation, show that the parties had agreed upon any particular words or language to be used in the instrument, but only to show that they agreed to accomplish a particular object by the instrument and that the instrument, as executed, is insufficient to execute their intention. *King v. Riley*, 498 S.W.2d 564, 566 (Mo.1973); *Dutton v. Dutton*, 668 S.W.2d 585, 590 (Mo.App.1984); *Bollinger v. Sigman*, 520 S.W.2d 710, 712[3] (Mo.App. 1975).

■ "Reformation of a written instrument in equity will be decreed when the words that it contains do not correctly express the meaning that the parties agreed upon, as the court finds to be convincingly proved." *St. Louis Rlty. v. Mark Twain S. Cty. Bank*, 651 S.W.2d 568, 574 (Mo. App.1983). The power to reform instruments is not confined to the correction of erroneous omissions or insertions but includes the correction of indefinite or inaccurate expressions. 76 C.J.S. Ref. of Instr. § 37, p. 383.

■ Defendants argue that the term used in the leases—"the United States Bureau of Labor Statistics Living Standard Index"—is not ambiguous, and therefore extrinsic evidence concerning its meaning was inadmissible. This position is unsound for two independent reasons. First, ambiguity is not a prerequisite for reformation and, second, in a proceeding to reform a writing on the ground of mutual mistake, parol evidence is admissible to establish the mistake.

"[A]mbiguity is not the only basis for reformation of a written instrument. There may exist also a mistake of the scrivener of the instrument who does not incorporate therein the true prior intention of the parties which will entitle either to the remedy in equity of reformation of the instrument. See 76 C.J.S. Reformation of Instruments § 20, p. 344; 44 C.J.S. Insurance § 279c, p. 1117; 45 Am.Jur. Reformation of Instruments § 54, p. 616; Annotation, 26 A.L.R. 504, and the Missouri cases there discussed."

*Edwards v. Zahner*, 395 S.W.2d 185, 189 (Mo.1965). See *State v. Schwabe, supra*, l.c. 19[5]; *Schimmel Fur Co. v. Amer. Ind. Co.*, 440 S.W.2d 932, 938[7] (Mo.1969); *Ethridge v. Perryman*, 363 S.W.2d 696, 698 (Mo.1963). Restatement (Second) of Contracts § 155.

■ Where the evidence supports reformation, the remedy is not barred by the fact that the instrument sought to be reformed is unambiguous. *Rosen v. Westinghouse Electric Supply Co.*, 240 F.2d 488, 491[1, 2] (8th Cir.1957); *Carman v. Athearn*, 77 Cal.App.2d 585, 175 P.2d 926, 932[13] (1947); *Bilbao v. Krettinger*, 91 Idaho 69, 415 P.2d 712, 715 (1966); *Hausbrandt v. Hofler*, 117 Iowa 103, 90 N.W. 494, 495 (1902); *Snider v. Marple*, 168 Kan. 459, 213 P.2d 984, 989[4] (1950); *Elysian Homes v. Davis*, 231 La. 95, 90 So.2d 791, 792[2, 3] (1956); 76 C.J.S. Ref. of

Instr. § 8, p. 333; 66 Am.Jur.2d Ref. of Instr. § 6, p. 532.

In a proceeding to reform an instrument on the ground of mutual mistake, parol evidence is admissible to establish the fact of mistake and in what it consisted and to show how the writing should be reformed to conform to the intention of the parties. *State v. Schwabe, supra*, l.c. 19[5]; *Walters v. Tucker, supra*, l.c. 675[1]; *Dougherty v. Dougherty*, 204 Mo. 228, 102 S.W. 1099, 1101 (1907); *Snider v. Miller*, 352 S.W.2d 161, 165[7] (Mo.App. 1961); *Wood v. Utter*, 229 Mo.App. 309, 77 S.W.2d 832, 836 (1935); 66 Am.Jur.2d Ref. of Instr. § 118; 76 C.J.S. Ref. of Instr. § 83b, p. 452. The rationale of the foregoing authorities is that the very nature of a reformation action is such that it is outside the field of operation of the parol evidence rule. Parol or extrinsic evidence is not received for the purpose of varying the contract of the parties but to show what their contract really was. The thing being reformed is the writing, not the contract.

In support of (b), defendants rely on paragraph 14 of each lease which reads, in pertinent part:

"This lease ... represents the entire agreement between the parties hereto and there are no collateral oral agreements or understandings of any kind whatsoever; and further, neither party shall be bound by any statement or representations of any kind or nature whatsoever made by either party or their agents or representatives unless set forth in this lease agreement...."

What has been said with regard to the inapplicability of the parol evidence rule, in an action for reformation based on mutual mistake, also applies to a so-called merger clause. See Williston on Contracts, 3rd Ed., § 811.

"[A] general merger clause in a written contract, to the effect that it expresses the entire agreement and that no asserted extrinsic representations are binding, will not, of itself, bar parol evidence introduced for the purpose of reforming the instrument on the ground of mistake." 66 Am.Jur.2d Ref. of Instr. § 118, p. 645.

It will be remembered that the trial court made several findings and conclusions set forth above. Defendants' first point does not challenge the *sufficiency* of the evidence to support those findings and conclusions. The point challenges only the *admissibility* of the evidence.

This court holds that neither the parol evidence rule nor the merger clause in the leases precluded the trial court from considering extrinsic evidence concerning the intention of the parties with respect to rental adjustments.

In contending that the rent adjustment provisions of the lease are unenforceable because the misnamed index does not exist, defendants rely primarily upon *Seattle–First National Bank v. Earl*, 17 Wash.App. 830, 565 P.2d 1215 (1977); *Johnston v. First Nat. Bank & Trust Co.*, 624 S.W.2d 500 (Mo.App.1981); and *Dehner Urban Redev. Corp. v. Dunn & Brad.*, 567 S.W.2d 700 (Mo.App.1978), all involving leases containing rent escalation clauses.

Seeking to uphold the trial court's ruling, lessor relies primarily upon *Barnes v. Wood*, 750 P.2d 1226 (Utah App.1988); *Phil Bramsen Dist. Inc. v. Mastroni*, 151 Ariz. 194, 726 P.2d 610 (Ariz.App.1986); *Coleman v. Villa Capri Restaurant*, 712 S.W.2d 65 (Mo.App.1986); and *Satterfield v. Layton*, 669 S.W.2d 287 (Mo.App.1984), together with Missouri cases expressing general principles concerning the remedy of reformation.

Other cases involving lease escalation clauses tied into a cost of living index include *Trautman v. Hill*, 116 Idaho 337, 775 P.2d 651 (Idaho App.1989); *Bonfanti v. Davis*, 487 So.2d 165 (La.App.1986); and *Skeoch v. Electri–Center*, 778 P.2d 104 (Wyo.1989). See generally 87 A.L.R.3d 986 (rent adjustment based on outside formula).

In *Seattle–First Nat. Bank*, a lease executed in 1958 contained a clause calling for an annual adjustment in rent based on "the cost of living figures for the city of Spokane, issued by the United States Bureau of Labor Statistics." The first demand for

adjustment was made by the landlord in 1972, calling for rental adjustments for 1970, 1971 and 1972. The tenants (except for one who had made a settlement) first paid the adjusted rent in 1973 and did so under protest.

The court, in a 2-to-1 decision, held that the index was nonexistent, there being no such index for the city of Spokane, that there was no basis for reformation because the lease accurately reflected the agreement of the parties, and that there was merely a unilateral mistake which was that of the lessor.

In *Johnston*, three lessees brought a declaratory judgment action against their mutual lessor, challenging the enforceability of a rent escalation clause based on a Consumer Price Index. The clause called for annual adjustments. Two of the leases commenced in 1972 and the other lease commenced in 1974. The lessor made no attempt to enforce the clause until November, 1978, when it billed the three plaintiffs at an increased rate for 1977 and all prior years. Two of the lessees refused to pay the increase. The third lessee, one Vogel, paid the rent, both for past and future periods. The trial court found in favor of all three lessees and held the provision unenforceable.

On appeal, this court found in favor of the lessor with respect to Vogel, but against the lessor with respect to the other two lessees. This court said that Vogel, having acquiesced in the claim for increases and having paid them, was bound by that decision. With respect to Vogel, the court said that where an agreement is ambiguous, the construction placed on it by the parties as evidenced by their acts or conduct will generally be adopted by the court.

With respect to the other two tenants, however, the court held the escalation clause to be unenforceable. There were no negotiations prior to the execution of the lease, between these two lessees and the lessor, with regard to rental increases un-

der the Consumer Price Index, nor did those two lessees acquiesce, after the lease was signed, in the manner in which the landlord attempted to compute the claimed increase. This court also said that the wording of the lease was such that there was no way to determine how the rental increases should be calculated.

In *Dehner* the escalation clause in the lease did not involve the Cost of Living Index. It did call for rent to be increased based on real estate taxes "for the first tax year after the beginning of the term of this lease in which the property with all improvements is assessed for real estate tax purposes." The lease was executed in 1962 after much prior discussion between the parties concerning the escalations. From 1966 until 1975, the landlord charged the lessee additional rent based on the escalation clause, and the lessee paid the increases through 1972. Under the language of the lease, the base tax year for increases was 1973, because that was the first year when the property "with all improvements" was assessed.

The court of appeals affirmed the judgment of the trial court which denied the lessor's request for reformation and permitted the lessee to recover the increases paid prior to 1973. On appeal, the lessor emphasized the fact that the lessee had paid the rent for several years prior to 1973, based on the escalation clause. The court said that it is only when the contract is unclear that the court considers evidence of how the contract was acted upon by the parties.[4] The court also said, "The trial court found the tax escalator clause of this lease agreement was not ambiguous or susceptible of more than one meaning, and plaintiff has not challenged that finding on appeal." The court said the evidence supported the trial court's judgment denying reformation.

Although *Seattle–First* generally supports the position of instant lessees, there are some factual differences. In *Seattle–First* the first demand for adjustment was

4. None of the three cases cited by the court in support of that statement was an action for reformation.

made after three years, for which adjustments were claimed, had elapsed. The only escalation paid was paid under protest. In the case at bar, as pointed out in footnote 2, escalation payments were made without protest under 17 of the 21 leases. Also, in the case at bar, no protest was made by anyone prior to July, 1980, although the lessor, as shown by paragraphs 5 and 6 of the stipulated facts, made rental adjustments beginning in 1972, and did so with regard to all leases.

*Johnston* is distinguishable insofar as the prevailing lessees in *Johnston* are concerned. Indeed, the losing lessee in *Johnston*, Vogel, occupied a position similar to the lessees in the 17 leases here where escalations were paid without protest. In *Johnston* the lessor made no attempt to enforce the clause until several years after the alleged escalations were due. The court also said that the wording of the lease was such that there was no way to determine how the increases should be calculated. That is not the situation here. See, again, paragraphs 5 and 6 of the parties' stipulation.

*Dehner*, although factually distinguishable, does lend support to defendants' position. *Dehner* did not involve a cost of living index. The lease in *Dehner* was unambiguous. In the case at bar there was an index and it was mislabeled. To the extent, however, that *Dehner* appears to hold that an unambiguous writing may not be reformed, it is inconsistent with the Missouri cases and other authorities previously cited which are to the effect that lack of ambiguity does not preclude reformation. This court is bound by *Edwards v. Zahner, supra,* and the other decisions of the Missouri Supreme Court cited above.

*Barnes* involved facts strikingly similar to those at bar. In 1979, the parties entered into a 10–year lease which provided for rental adjustments "based upon the United States Cost of Living Index, using August 1976 as a base." Lessee paid the stipulated rent through August, 1979. In September, 1979, the lessee paid increased rent based on the escalation clause. The lessors sued when the lessee refused to pay

subsequent escalations. The trial court found that the term "United States Cost of Living Index" was ambiguous and, over the lessee's objection, accepted extrinsic evidence to ascertain what the parties intended by the use of that term. The trial court determined that the parties intended to use the "Consumer Price Index–All Urban Consumers," (the CPI–U), and that escalations should be calculated applying that index.

In affirming the ruling of the trial court, the appellate court rejected the lessee's contention that the trial court erred by admitting extrinsic evidence to ascertain what the parties meant in using the term "United States Cost of Living Index." The appellate court approved the trial court's finding that the term was ambiguous and that the extrinsic evidence was admissible. It pointed out that the trial court did not rewrite the agreement but admitted evidence to determine the parties' intent by the use of the term. The court also pointed out that the lessee acquiesced in the original escalation which was based on the CPI–U. The court also said, at p. 1231, "The use of the term United States Cost of Living Index in the context of this case can be described merely as a general description of the index to be used rather than the name of a specific index." The court found that *Seattle–First Nat. Bank* and *Johnston* were distinguishable factually. The court said at p. 1232:

"Here, unlike the parties in *Seattle–First Nat. Bank,* the parties did not intend to use a specific cost of living index which did not exist. Rather, the lease mislabeled the intended index using a general term. The parties intended to use and in fact used an index covering the United States as a whole without excluding any items or sub-regions, which, in substance, is the [CPI–U]."

The court also said:

"Here, as plaintiff Vogel in *Johnston,* [lessee] acquiesced to [lessor's] demand for an increase in rent … As in *Johnston,* the parties conduct supports the conclusion that [the lessee] adopted the 'cost of living figures' obtained from the United States government.... Moreover,

in *Johnston*, there was no indication as to which category of the consumer price index the parties intended to use. Here ... the evidence supports the trial court's findings that the parties intended to use an index that covered the United States as a whole, not excluding any items or sub-regions. The Consumer Price Index–All Urban Consumers fairly comports with those intentions."

In *Phil Bramsen Dist., Inc.*, the parties, in 1975, entered into a 20–year lease which contained an escalation clause calling for escalations every five years. The clause required the escalation to be computed based on the "Consumer Price Index for Phoenix, Arizona ... prepared by the United States Bureau of Labor Statistics." There was no such index for Phoenix. The trial court found in favor of the lessor and reformed the rent escalation clause to eliminate the reference to Phoenix, Arizona. The Arizona Court of Appeals upheld the reformation. The drafter of the lease was the attorney for the lessor. The court said the parties clearly intended to have an escalation clause based on inflations, that it was only the error of the scrivener that caused the escalation clause to be unenforceable and that the trial court could have found that there was a mutual mistake. The court said no equitable reason appeared for refusing to reform the lease and otherwise the lessee would receive an unconscionable windfall if allowed to enforce his lease without escalation. The court also said that the language in the lease was not ambiguous but that fact did not preclude reformation.

In *Coleman* a lease contained an escalation clause based on "the last wholesale Consumer Price Index issued by the U.S. Government," with respect to a certain date. For almost two years the defendant paid rental increases. In a suit by the lessor for subsequent unpaid rent the court of appeals, citing *Johnston*, said: "The defendant, having acquiesced in plaintiff's claim for increased rent and having paid it, is bound by that decision."

In *Satterfield* the escalation clause in a lease included, as one factor, "increase in

Cost of Living Index over a base period of April 1, 1977, to April 1, 1982." The lessee claimed the clause was ambiguous. Rejecting that contention, the court of appeals said, at 288–289.

"The cost of living portion of the contract is clearly not ambiguous. The term 'Cost of Living Index' is commonly understood to refer to the Consumer Price Index for all items determined by the United States Department of Labor. See Webster's Third New International Dictionary, 515 (unabridged, 1976). When used without qualification, it is generally taken to mean the national average figures."

The court also pointed out that there was no disagreement concerning the formula to be used to compute the increase in rent, distinguishing *Johnston*.

In *Trautman* the court upheld an escalation clause and rejected arguments by the lessee that the lease reflected a unilateral mistake by the lessor and identified a nonexistent index and provided no enforceable basis for the calculation of rental adjustments. The lease provided for rent adjustments every two years based on a formula which referred to "the Consumer Price Index for all items, as published by the United States Department of Labor, Bureau of Labor Statistics, for the full calendar quarter preceding the adjustment date." The lessee argued that the index described did not exist on or after the date the lease was signed and that the court should follow *Seattle–First*. The court discussed at length the history of the CPI–W and the CPI–U. The lease was executed in 1978. The court rejected the lessee's contention that the index named in the lease was nonexistent and held that the index had continued, although in a revised form. The court said, 775 P.2d at 656:

"We decline to apply the rule set forth in *Seattle–First* ... [Lessee] has not established that the rental adjustment language in the lease constitutes a material mistake requiring nullification of the escalator clause. The 'mistake' that occurred here lies not in the formation of the parties' contract but in the failure to

express that agreement in a completely clear and correct manner. If any remedy is required, minor reformation of language is more appropriate than excision of the language, as less damage will be done to the parties' overall agreement concerning rental payments. Application of the 'revised' Urban Wage Earners' and Clerical Workers' Index would effectively utilize the same index specified in the lease."

In *Bonfanti* the court upheld an escalation clause in a lease for a term beginning March 1, 1979, and ending September 30, 1982. The clause included a factor described as "an amount equal to any increase in the cost of living index over the base index in existence as of January 1, 1980." The lessee contended that the rental was uncertain because there were two cost of living indices—the CPI–W and the CPI–U—and the lease did not specify which index would be used. The lessor had actually used the CPI–W, which resulted in a slightly lower rent than would have resulted from the use of the CPI–U. The increases began in April, 1981, and the lessee did not question the amounts until payments ceased during the latter part of 1981. The court said a reasonable interpretation of the intentions of the parties was that they intended that the increase in rent be based on the CPI–W.

In *Skeoch*, in a lease entered into in 1979, the escalation clause required adjustments to be based on "Consumer Price Index, hereinafter called the index, for the state of Wyoming, compiled by the Department of Labor and Statistics for the state of Wyoming." From 1979 until 1987 the lessor used the federal index, "the United States Consumer Price Index," and not the Wyoming Cost of Living Index (state index). The lessor had used the federal index because the state index, after 1978, was no longer published by the Wyoming Department of Labor and Statistics. The trial court found that the state index was the proper one to use, and this result was affirmed. The Wyoming Supreme Court said:

"Although erroneously described, the index was easily identified and no basic ambiguity results.... This was not a nonexistent index case; the Wyoming index involved a change of agency for the preparation of a continued index. The trial court consequently utilized the same index that had been negotiated."

Although the lessor had improperly used the federal index instead of the state index as required by the lease, and the lessee was accorded relief on that ground, the mislabeling of the state index was no bar to its use if the lessor had used it.

*Barnes, Phil Bramsen, Coleman, Satterfield, Trautman, Bonfanti,* and *Skeoch* support the trial court's conclusions of law. Although defendants' first point does not challenge the sufficiency of the evidence to support the trial court's ruling, that challenge is found in defendants' argument, and this court holds that the argument has no merit. Indeed, the reply brief of lessees contains this statement: "There is no dispute that based on the post-execution conduct of the parties there is evidence that would support the Circuit Court's conclusion that the parties intended to provide for rental escalations based upon an index published under the title Consumer Price Index if, indeed, the land leases are ambiguous as a matter of law."

Without minimizing the significance of other facts contained in the stipulation of the parties or found by the trial court, this court places great importance upon paragraph 6 of the parties' stipulation, supra.

Defendants' second point is that the trial court erred in finding that defendants Burkhart, Merten, Simpson, Wertzberger, Johnson and Estate 100 Partnership agreed to rental escalations based upon the CPI–W and CPI–U because each of those defendants "protested to escalations based upon an index published under the title Consumer Price Index either prior to or contemporaneously with paying the rental following their first notice of escalation."

It will be recalled that footnote 2 states that escalation payments were made under 17 of the 21 leases without protest. Although it is true that defendants Burkhart and Johnson did not themselves make an

escalation payment without protest, each of those two is an assignee of a lessee who did make such a payment. Thus, Burkhart and Johnson were in the same legal position as the lessees under the other 15 leases where escalation payments were made without protest. See *Snider v. Miller*, 352 S.W.2d 161, 164[4] (Mo.App.1961).

It is true that the other four lessees mentioned in defendants' second point protested the initial escalation payment. They seem to take the position, in their second point, that the fact that protest was made is alone sufficient to render the trial court's judgment erroneous with respect to them.

The trial court, after receiving oral testimony in addition to the stipulated facts, reformed all 21 leases. This court's discussion of defendants' first point agrees with that ruling. With regard to the instant four leases, defendants' brief makes no mention of any evidence concerning negotiations between any of them and the lessor which took place prior to the signing of the four leases or concerning the parties' respective intentions at the time of signing. Defendants point to no evidence that any of these four lessees did not intend to pay escalated rent. Significantly, none of these four lessees challenges the trial court's findings of fact (a), (b), (c) and (d).

█ Where there is a duty to pay, the mere making of a protest by the payor when payment is made does not diminish his duty to pay. The protest alone, unsupported by any facts, furnishes no basis for recapture of the payment. See *Ferguson v. Butler County*, 297 Mo. 20, 247 S.W. 795, 796[2] (1923); *American Motorists Ins. Co. v. Shrock*, 447 S.W.2d 809, 812 (Mo.App.1969). Defendants' second point has no merit.

Defendants' third point reads:

"The circuit court erred in reforming the land leases between appellants and respondent because there was no mutual mistake of fact with regard to whether the term United States Bureau of Labor Statistics Living Standard Index properly described the index which would be used to calculate rental adjustments in that Mr. Duenke [lessor] was aware at the time each of the land leases at issue were executed that the United States Bureau of Labor Statistics Living Standard Index was not the index which he intended to use to calculate the rental escalations."

In their argument under this point, defendants state: "[I]t is uncontroverted Mr. Duenke was aware that the term 'United States Bureau of Labor Statistics Living Standard Index' did not accurately describe the index which he intended to use to calculate escalation to Appellants' rental rates at the time each of the leases at issue was executed." The brief also says: "Mr. Duenke testified that at the time each of the leases was executed he intended to escalate rentals based upon one of the indices published under the heading Consumer Price Index."

This argument is based on three affirmative answers given by lessor Duenke to leading questions propounded by lessees' counsel on cross-examination. That testimony is as follows:

"Q. Now, back in 1972 you knew that the index that you wanted to use to escalate rental rates for property in Tan–Tar–A Estates was one of the indices published under the heading Consumer Price Index; isn't that correct?

A. Yes.

Q. You continued after 1972 to utilize lease forms that do not make any reference to any index entitled Consumer Price Index, did you not?

A. Yes.

Q. And in fact the leases which you used with respect to each of the defendants in this case made reference to changes in the cost of living based on the United States Bureau of Labor Statistics Living Standard Index, did they not?

A. Yes."

It is true that in 1972 lessor intended to use the CPI–W and in fact did so until he commenced using CPI–U in 1978. It is also true that the leases did not identify the CPI–W or the CPI–U by their correct title. It is also true that the leases contained the misnamed index. All of those facts have

been considered at length under defendants' first point. Defendants' briefs in this court make no claim of any fraud on the part of Mr. Duenke, nor do they mention that any such claim was made in the trial court. Mr. Duenke made no effort to conceal his conduct. See paragraph 6 of the parties' stipulation. Lessor's brief makes this statement:

"However, the reason Respondent did not change the wording in the leases prior to 1980 is because he believed the terminology used in the lease adequately described the parties intention to have rental adjustments made to reflect the change in cost of living based upon the Cost of Living Index. It was only when the current dispute arose that Respondent clarified the index reference to avoid any future misunderstanding. Moreover, Respondent never had any reason to doubt the rental adjustment terminology previously because the adjustments were routinely paid without protest or question. In fact, the overwhelming majority of the Tan–Tar–A estate lessees continue to pay their rental adjustments without protest and have not joined in this lawsuit." (Transcript citations omitted.)

That statement is a fair overview of the lessor's testimony. There was no evidence that lessor knew that the index was in fact misnamed and, with such knowledge, deliberately or fraudulently refrained from correcting it. The evidence supported the findings of the trial court that these leases involved mutual mistake. See the trial court's findings of fact (a), (c) and (d). Defendants' third point has no merit.

Defendants' fourth point is that the trial court erred in denying defendants' motion to certify this action as a class action on behalf of all present and former leaseholders under Rule 52.08.

At oral argument, defendants' counsel stated that if defendants' first three points were ruled against them, which is the situation, their fourth point became moot. "No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the *appellant* materially affecting the *merits* of the action." Rule 84.13(b). A trial court's ruling with regard to class action treatment is a ruling which "ultimately rests within the sound discretion of the trial court," *City of St. Peters v. Gronefeld,* 609 S.W.2d 437, 439[1] (Mo.App. 1980). Any error in that ruling would not affect the appellants individually because their appeal has failed. This court finds it unnecessary to rule on defendants' fourth point. Cf. *United States Parole Com'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 1211[5–7], 63 L.Ed.2d 479 (1980). See 33 A.L.R.Fed. 570.

The judgment is affirmed.

HOGAN and SHRUM, JJ., concur.